## The People v. William Dean.

*Constitutional law.    Meaning of the phrase "white male citizen.."*   All persons in whom white blood so far preponderates that they have less than one-fourth of African blood, are within the meaning of that clause of the Constitution of Michigan which limits the elective franchise to "white male citizens"; and no other persons of African descent can be so regarded.

*Heard May 1st.     Decided July 11th.*

Error to Wayne Circuit.

Indictment for illegal voting. The facts are stated in the opinion.

*A. Williams, Attorney General,* for the People.

1. Under the head of Analogy we submit:

*a.* That *Sec.* 4351 *Comp. L.* prescribes that the names to be placed upon the list of persons to serve as grand and petit jurors, shall be those "having the qualifications of electors." In making these lists, the practice throughout the State has ever been to exclude therefrom all persons known to possess any negro or African blood in their veins.

*b.* That *Sec.* 1, *Art.* 17, of our State Constitution provides that "the militia shall be composed of all able-bodied white male citizens, between the ages of eighteen and forty-five years," &c. See also *Sec.* 641 *Comp. L.*, and *Act No.* 16, *Laws of* 1862, of this State, which provide for organizing the military force of the State, and making liable to enrollment only "*white* male citizens or inhabitants." In executing these statutory and constitutional provisions, persons known to be at all affected by possessing negro or African blood, have never been enrolled as a part of the military force of the State; and,

*c.* That *Sec.* 629, *Comp. L.*, in relation to taking the census of the State, provides, among other things, for the enumeration of "the number of *colored* persons." In taking the census we submit that in pursuance of the above mentioned clause, persons having even one-sixteenth part of negro or African blood in their veins, have always been enumerated as "*colored* persons," and not as *white*.

2. As it regards Custom, we submit:

*a.* That persons belonging to the white race have not intermarried with those known to have any negro or African blood in their veins. At least, this has been the rule, and one admitting only of rare exceptions; for such marriages have ever been denominated "amalgamation," and considered disgraceful.

*b.* That persons known to have more or less negro or African blood in their veins, have uniformly been excluded from ordinary social and familiar intercourse with white persons; the former everywhere, in this country, constituting a class by themselves for all such purposes; and,

*c.* That the prejudice which has existed in the mind of the white people of this State towards our colored population, has not been confined to the negro, mulatto, quadroon and mustee, but it has extended to all known to have any African blood in their veins. Hence, our legislation, wherever it has been prejudicial, on account of color, was so framed as to almost always bring within its purview all such persons. And the

same is more or less true of the ruling class throughout the United States.

3. And now turning to Authority, it would seem that the Court did not err in the construction of the above mentioned provisions of the constitution, embraced in his charge; for

*a.* From the time of the organization of our State government to the present moment, the clause " white male citizen" has never been understood as embracing any persons having any known negro or African blood in their veins; and from the time of the adoption of the revised constitution of 1850, to this day, the words " civilized inhabitant of Indian descent" have not been treated as including all, or any individuals commonly denominated " colored persons." On the contrary, the received construction has been that quadroons, mustees, &c., were neither " white male citizens" nor " civilized inhabitants of Indian descent," within the spirit and meaning of these constitutional provisions; and, therefore, they have not been regarded as electors and entitled to vote,—they never having attended our elections claiming that high prerogative.

*b.* The fact that quadroons, mustees, &c., have not been held to be electors, by the great body of the people of Michigan, is further evidenced by the consideration, (now a noticeable feature of our history as a State,) that we have never elected them to office, however well qualified, therefor, more or less of them may have been; for if they were electors, they would have been eligible, and we might have elected them to office; otherwise not.—*Comp. L.* §§ 594–5; *State Constitution,* § 5, *Art. 4, and Sec. 2, Art. 5.*

*c.* In the debates of the convention of 1850, the words " white" and " colored" were invariably used by the honorable members of that body, in contradistinction to each other,—the former, in its use, having reference to the pure European race, distinguished from the Asiatic, Malay, American and African races, " by a natural complexion of white, mingled with red," and the latter to all who had more or less African or negro blood in their veins; being in fact the same descrip-

tion or class of persons then held in slavery in the Southern States. So, too, did the people use and understand these words, "white" and "colored," at the time they considered and adopted this revised constitution; and so, also, have they understood and administered them ever since, for "the whites of America are descended from emigrants of the several nations of Europe, and resemble, in appearance, those from which they are descended."— *Woodb. & Will. Geog. (Ed.* 1833,) 165–9; *Conven. Deb. of Mich.* 1850, *pp.* 279, 289, 482, 507, 757, 764, 914.

We submit, too, that the construction of these clauses of the constitution, embraced in said charge, is the only and first one that would suggest itself to the mind of any person acquainted with the institutions of our country, the races of men living within its limits, and the prejudices and purposes of the European race living in the United States towards the negro or colored race, from the time they first became "property" on the soil of this country, even to the present hour.

In the following cases, 2 *Doug. Mich.* 411; 5 *Mich.* 520, it will be observed that the words " white" and " colored," when used either by counsel or court, had reference, in each instance, to the same kind or description of persons as when used in the debates of said constitutional convention of 1850, and as the people of this State have ever employed them.

The following authorities, we think, will be found to the same effect as the two last above cited:—2 *Kent's Com.* 254, 258, *note b;* 14 *Ohio,* 199; 3 *Rich. R.* 136; 4 *Gratt.* 541; 9 *Ired.* 384; 18 *Ala.* 276; 2 *Carter, (Ind.)* 332; 14 *Geo.* 185; 20 *Id.* 480; 5 *Florida,* 261; 5 *Jones, (N. C.)* 11; 37 *Miss.* 209.

4. We submit, then, that disposing of the question under consideration, either by analogy, custom or authority, or by all these lights; by the legislation of our State; by the social and familiar customs of the white and colored races; by the prejudices and purposes of " the whites," resulting in various public policies; by the practical exposition thus far given to our constitution and laws, and by the first meaning that fast-

ened in the mind when we read this part of the fundamental law of the State, we can come to no conclusion that will command the judgment, but that the said convention of 1850, and the people who adopted the revised constitution proposed by them, intended that all "colored persons," including those like this plaintiff in error, should be excluded from all participation in our elections. With the justice and wisdom of such exclusion we have nothing to do; but simply to ascertain and give force and effect to the intention of these constitutional provisions.

*Knight & Jennison, Larned & Hebden,* and *H. M. Cheever,* for defendant.

1. The qualifications of electors in this State are defined by the constitution. So far as may be applicable to this case the language is, "every white male citizen," and "every civilized male inhabitant of Indian descent, a native of the United States, and not a member of any tribe."—Art. VII., §1.

We insist that defendant was a "white male citizen" within the meaning of the constitution. This is the only question in the case, as all the requests to charge are based upon the assumption that he possessed all the other requisite qualifications of an elector.

*a.* The word white, applied to persons, means one of the Caucasian race, without any African blood, or, at most, with not one-quarter part African blood.—*Bouv. Inst. p.* 70; 3 *Dana,* 382.

*b.* Mulatto, means muled, or a mixed breed, from the Latin *mulus*; French, *mulatre,* born from different colored people. The offspring of a negro by a white, or a white by a negro.—*Brand's Ency. of Science, Lit. and Art;* 18 *Ala.* 276; 1 *Bail.* (*S. C.*) 273; 1 *Id.* 275; 7 *Mass.* 88.

We submit that the word "white" is used in our State constitution with reference to race, and not color. It doubtless excludes Indians, as well as Africans, and hence a specific clause was deemed necessary to give suffrage to the former.

This clause includes equally Indians of the full blood and half blood.—9 *Mich.* 435.

It is, in either case, a question of race, and not mere color. There is no neutral ground; each person belongs to one or the other, and not to neither race.

Where the two races are equal before the law, the line of division must be in the middle; and if the white blood preponderates, the person is of the white race; if the black exceeds the white, he is of the black race.

This seems to have been the construction given to a similar constitutional provision in Ohio. The Constitution of 1842 in that State gave the elective franchise to "free white citizens." Parker Jeffries, the child of a white man and a half-breed Indian woman, offered his vote, and on its being rejected, sued the trustees of election. The court held he was a lawful voter, and say: "This matter is clearly settled that all nearer white than black are entitled to vote. No other rule can be adopted, so intelligible and practicable as this, and further refinement would lead to inconvenience, and no good result."—11 *Ohio*, 372.

In another case the evidence showed there was some black blood, and plaintiff asked a similar charge to the one requested in the present case; that if plaintiff was nearer white than mulatto, he was entitled to vote. The court refused, but did charge that if he had any negro blood he was not a voter. It was held error.—11 *Ohio*, 376.

In 1859, a suit was brought against the election judges for refusing to receive the vote of a person whose father was white, and his mother three-fourths white and one-fourth black; and Gholson J., in delivering the opinion says: "The constitution uses the words, 'all white male inhabitants,' etc., 'shall be electors.'" The question is, who are white within the meaning of this provision. It was considered in view of blood or race, and the rule adopted to meet the difficulty of a mixture of blood or race, was, that the white race must predominate. There was a white race and a black race, and the obvi-

ous intent was to exclude the black from the elective franchise. If a person has a larger proportion of white than black blood, he is white within the meaning of the constitution.—9 *Ohio*, (*N. S.*) 568. The word white describes blood, not complexion. — *Wright*, 578.

2. Similar language used in statutes has also been construed to refer to a preponderance of white blood.

*a.* This has been the construction in Northern states.

Under an old statute of Ohio, in 1829, black and mulatto persons were disqualified as witnesses in cases where the parties were white. On indictment for felony, the prisoner being a *quarteron*, the prosecution called to the stand a negro as a witness. Prisoner's counsel objected, on the ground of his incompetency under the statute. The court admitted the witness. Exceptions were taken, and, on error, the Supreme Court held the witness was improperly admitted, as the prisoner was to be regarded as a white person. The court say: " Color alone is insufficient. We believe a man of a race nearer white than mulatto is admissible as a witness."—4 *Ham.* 354, (*Ohio, Cond.*, 1–4, 821.)

Under a similar statute in Virginia, a witness who was offered was proved to have less than one-fourth negro blood. The court held that he was a competent witness.—4 *Grattan*, 541.

When the school law makes schools " free to all white children," all who have more ·than one-half white blood are entitled to the benefits of the law.— *Wright*, 578; 12 *Ohio*, 237.

*b.* In the late slave States, where courts have expressly recognized an inequality of the races, a large preponderance of white blood has been held to include the person within the white race.

In Alabama, a statute provided that " every slave, free negro, or mulatto, who shall commit, or attempt to commit, a rape on a white woman, shall, if convicted, be punished by death." One Thurman was indicted as a mulatto under this statute, and convicted. He was, proved, to. be.the offspring of a mulatto

father and a white mother—a quadroon. The Court, on error, held he was not a mulatto, and did not come within the statute. The Court say: "If the Legislature had intended to describe a caste, to include negroes, and all persons descended from negro stock on one side, and to subject them to certain penalties, it is to be presumed that they would have done so in clear language. If the statute against mulattoes is, by construction, to include quadroons, then where are we bound to stop? If we take the first step by construction, are we not bound to pursue the line of descendants so long as there is a drop of negro blood remaining?"—18 *Ala.* 276.

*c.* For a discussion of similar questions of construction, see 1 *Dev.* 376; 4 *Id.* 340; 9 *Ired.* 384; 5 *Jones* (*Law*) 11; 20 *Geo.* 512.

The term *white*, used in connection with other subjects, and relating to color, in a statute, does not mean an absolutely pure white. A provision that "no ballot shall be received or counted unless the same is on white paper," was held to mean that a ballot on white paper tinged with blue was upon white paper, within the meaning of the statute.—15 *Ill.* 492.

3. The Constitution of the United States having entirely obliterated slavery, there remains no legal reason, aside from specific enactments, for making a distinction between the races.

The universal and all-prevailing theories of our Government are utterly antagonistic to all caste, arising from property or blood. Where there is manifest in the constitution and laws of the State a prevailing legal policy, the courts will not strain the construction of particular language against such known policy.

We ask no unnatural or unreasonable construction of the constitution; we seek only such an enunciation of its principles as shall be in accordance with justice and equal rights.

CAMPBELL J.

Defendant was prosecuted for illegal voting; he, as alleged, not being within the constitutional provisions regulating the

qualifications of voters. Two propositions were discussed on the trial, and charges were asked or made upon both of them; *first*, whether a person of less than one-half of African blood was *white*, within the meaning of the Constitution; *second*, whether one of not more than one-sixteenth African blood was *white*. The Circuit Judge charged against the prisoner on both points, and exceptions are taken to his rulings.

A decision of the second question would probably, (so far as we can judge from the testimony set forth,) dispose of this case; but as the case is evidently designed to obtain a ruling upon the general subject, in order to settle the position of persons of mixed blood under our Constitution, it would not be desirable to avoid the principal question. The Constitution now in force gives the right of voting, (under certain restrictions,) to "*white male*" citizens or inhabitants, and certain civilized male inhabitants of *Indian descent*. The former Constitution confined the privilege to "white male" citizens or inhabitants. At the time when the present Constitution was submitted to a popular vote, a separate proposition was submitted with it, whereby, if adopted, "*every colored male inhabitant*" would have been put upon precisely the same footing, as an elector, as if he were white. This proposition was rejected, and the Constitution, therefore, admitted none to be electors who were not "*white.*"

The origin of this regulation, so far as the State of Michigan is concerned, is to be found in the act of Congress of February 16, 1819, authorizing the election of a delegate to Congress from Michigan territory, giving the right of voting to "*free white male citizens*," who had resided here a certain time, and paid taxes. This was followed by the act of Congress of March 3, 1823, (amendatory of the various territorial regulations of Congress,) which fixed the same standard for electors, in all elections for any purpose to be had within the territory. (*L.* 1827, *pp.* 34, 35.) The first act proposing the erection of a State Government, passed June 29, 1832, submitted the question to the votes of the "white male inhabitants," in their respective

districts. (*L.* 1832, *p.* 37.) The act of September 6, 1834, under which the census was taken as a preliminary to applying for admission into the Union, required the inhabitants to be classed as "white" or "colored" persons. (*L.* 1834, *pp.* 3, 4.) The latter were also divided into such as were "*free*" and such as were bound to serve for life, or for a term of years. This was probably to reach such colored persons as were retained by their former owners, within the terms of Jay's treaty of 1794, under which some cases had been decided by the Supreme Court of the Territory as not subject to the ordinance of 1787. The act of January 26, 1835, under which the delegates to the convention which framed the first Constitution were elected, provided that the "*free white male inhabitants*" of the Territory, who should have resided therein three months previous to the fourth day of April thereafter, should be authorized to vote for such delegates. (*L.* 1835, *pp.* 74–5.) That Constitution was by the convention required to be voted on by such persons as were thereby qualified "*to vote at all elections.*" (*Schedule, Const.* 1835, § 9.)

We are, therefore, to determine what was meant by the term "*white,*" when applied to the prevailing portion of the population, in whose hands the government of this region has been kept through this course of congressional, Territorial, conventional, and popular action, and from whose numbers the jurors were to be exclusively drawn, and who alone were, under the laws of the United States, subject to be enrolled among the militia. (*L.* 1827, *p.* 175; *Act of Cong. of March* 8, 1792; *L.* 1827, *p.* 417.)

There was no generally prevalent legal meaning which can be regarded as having become so attached to the word "white," as to have been of any governing weight in its adoption. It stands like any other phrase, used in laws and acts of state, which must be so construed as to carry out the design which its framers may fairly be supposed to have had in their minds. The reasons for drawing distinctions, in this country between different classes of inhabitants are notorious; and while the

course of events has, with the destruction of slavery, very considerably modified public opinion upon questions which bore upon the people formerly enslaved, and their kindred, we cannot regard provisions made under the old state of things as at all changed in their meaning by any subsequent events. If a popular regulation of to-day becomes unpopular in its operation to-morrow, no construction can make it mean to-morrow what it does not mean to-day. The duty of repealing laws and altering constitutions has not been imposed upon the judiciary. And I think we cannot truly interpret the language of our Constitution upon the subject of voting, without giving due consideration to the fact that it sprang from the existence of an extensive and remarkable prejudice, which has been recognized in all countries as one of the peculiar features of American society. There are few, if any, states whose statutes and constitutions have not been tinged by it; and the lines have been so plainly drawn in the popular mind, that those who have opposed these regulations, and those who have maintained them, have seldom quarreled very much over the extent of their application. They have been recognized and treated on all sides as designed to keep up a dividing line in the law, which should prevent the offending of social prejudice. Our State legislation has never sanctioned the discreditable penal enactments which put black men in the category of suspected criminals under bonds for good behavior, as was done in the Territory, and we have never, in State or Territory, attempted to make color a test of veracity in the witness box. There has been no very serious difference between the privileges of any of our inhabitants, in matters of mere private concern. But political distinctions have been perpetuated in the same language, since the origin of our elective system, in spite of strong efforts to eradicate them. And, in all this conflict of ideas, it must be borne in mind, that it has never occurred to any one that different shades of color could afford even a plausible ground of compromise. The mooted principle has been recognized as entirely outside of any shades

and gradations of color or blood; and those have only become important, when a practical rule became necessary to determine who could be classed as white or not white, by any test of reasonably easy application. For no one has, so far as I know, advanced the absurd notion that a preponderance of mixed blood, on one side or the other of any given standard, has the remotest bearing upon personal fitness or unfitness to possess political privileges. The subject cannot be discussed upon philosophical grounds, because there is no philosophical distinction involved. The recognition of slavery, in all probability, chiefly, if not entirely, created and confirmed the feeling which has so jealously separated the white race into the privileged and dominant people in this country. But the right of the people to determine the qualification of electors is undisputed. We are bound to adhere to the rule which they have established. The right to vote is granted to a certain designated class, and to no others. The voter must, without any undue straining of language in any direction, come within its terms. I think it has never been deemed improper to solve any reasonable doubts in his favor; and such is certainly the fair tendency of our institutions. But to go beyond this, from any motives of benevolence, or supposed public policy, would be to create, and not to construe, the law. The nature of the question precludes anything like absolute accuracy, because there are no infallible tests. Opinions may, therefore, very well differ as to the line which must be adopted, as, on the whole, most likely to divide electors from non-electors in closest accordance with the expressed will of the people. And if the term "white" had no ascertained and technically accurate legal meaning, when incorporated into the various instruments in which it is found to have operated in this State, then we must find its interpretation from the best sources open to us.

The cardinal rule of construction, concerning language, is to apply to it that meaning which it would naturally convey to the popular mind, in all cases where the propriety of such con-

struction is not negatived by some settled rule of law.    In all instruments which are submitted for confirmation to the people themselves, and which derive all their validity from a popular vote, such a construction is peculiarly necessary; for otherwise they would be defrauded of the right to frame their own government according to their own will.

When the people of Michigan decided to retain their ancient system, and to allow none but white persons to vote, they must have intended to embrace only such as were commonly so called and received.    Was a person in whom white blood simply predominated over negro blood thus regarded?    There may have been persons, and possibly even communities, who imagined there was some rule of law which gave to those in that condition the electoral rights of white persons; and there may have been others with whom social prejudices did not seriously affect their intercourse; yet, even among these, it cannot be maintained that they would have been esteemed white.    And it has never been the case that any one having visible tokens of African descent has been regarded by the community generally as a white person.    And where those tokens have been very slight, yet still perceptible to ordinary persons, they have caused their possessor to be distinctly classed among colored persons.    I think the mere intensity or weakness of these signs, when unmistakable, has made no difference in the classification.    And it is very well known that the associations of persons having visible portions of African blood, have generally been closer with each other than with those acknowledged as white.    They consider themselves as of one race, and live and act together.    This mutual recognition, coupled as it undoubtedly is with a general disposition on the part of white persons to avoid social relations with the mass of mixed, as well as unmixed, races of African descent, furnishes a commentary on the terms *white* and *colored*, which can hardly be resisted.    I think a conclusion which would convict all persons married in this State, of living in open adultery, where husband and wife are on differ-

ent sides of the mulatto standard, would shock the sense of the whole community, as contrary to all practice and under-. standing of the received division of races. If this rule has been misunderstood, such results of course cannot change it; but where language is used by the people for their own government, the recognized meaning cannot be ignored, without leading to inevitable mischief.

We are not left, however, to any individual opinions concerning the incorrectness of classifying those of visibly mixed blood among whites. There are many decisions upon the subject, made in different parts of the United States, and there have been many statutes passed, intended to furnish accurate means of determining the dividing line between the races. And in all of them, (except a class of decisions in Ohio), it is evident that it has not been deemed proper to class as white any not of pure blood, who could be distinguished without introducing uncertain tests. There is neither decision nor statute which places the criterion in the mere preponderance of either blood. And as the Ohio decisions stand alone, and have now been distinctly repudiated on principle by the courts of that State, and only adhered to in a single instance, where they had determined a rule of right, it may be well to refer to them.

The first case was *Gray v. The State*, (4 *Ohio*, 354), where a defendant upon trial objected to the testimony of a negro offered against him, as incompetent under the statute forbidding negroes or mulattoes to testify against white persons. The defendant was assumed to be of less than half negro blood, and was held on that account to be a white person. The decision is very brief, and bears every evidence of haste. The court declare in substance that the statute in question undertakes to divide the population of the State into white, black and mulatto, and that they are unable to point out any obvious distinction with certainty. They conclude by declaring that they were governed by two reasons in making the decision; *first*, because unwilling to extend the disabilities

of the statute; and, *second*, because of the difficulty of distinguishing among the several degrees of duskiness. It is somewhat singular, however, that the case *itself* exemplifies the fallacy of both of these positions. A penal statute applying in terms to none but blacks and mulattoes, could not under any circumstances include any others; and the defendant could not have been made out to be either a black or mulatto, by holding that he was not a white man. And, so far as relates to facility of distinction, the court in this case founded its judgment upon a finding of a judicial inspection of the party without any testimony whatever, and on the faith of such inspection was enabled to say that he was of mixed blood, somewhat more white than black; showing an ability to distinguish him readily from the white race by his appearance, and acting upon a test of color which it at the same time professed to repudiate.

The next case was *Williams v. School District No.* 6 (*Wright's R.* 578), where a person three-quarters white, and taxed for schools, complained of the exclusion from school of his children by a white wife. The law in express terms exempted none but negroes and mulattoes from school taxes, and then required all white children to be received. The court, while holding that his suit was too defective to be maintained, and therefore putting him out of court, asserted the authority of the former decision, and were severe upon the district for taking his money and yet refusing to receive his children. They, however, would have been treated as white by good authorities elsewhere.

In *Jeffries v. Ankeny* (11 *Ohio*, 372), where a person of one-fourth Indian and three-fourths white blood claimed the right to vote, the court saw fit to resort for the first time to the general rule concerning the condition of such persons as derived from public opinion, and declare them white; and from the peculiar manner in which *Gray's* case is referred to and quoted, and the care with which they abstain from referring expressly to any similar rule as applying to Indian blood,

it is evident that they felt a little awkward in classing blacks and Indians together, and that they had been very careless in their previous language.   They had found no such public opinion to aid them concerning mixed African blood, and it is too well known to require argument—and the facts stated in the decision show it—that Indian blood was never considered in that State, (as it was not considered here,) any detriment whatever to social consideration; and even half-breeds as well as quarter-breeds are by no means uncommonly reckoned among the whites, and are often quite undistinguishable from them in appearance and language.

*Thacker v. Hawk*, (11 *Ohio*, 376), was a case where the court below held that any mixture of African blood whatever disqualified a person from voting; (a doctrine which prevails nowhere;) and the judgment was reversed on the authority of *Gray's* case.   There are also some other decisions resting on the same authority, but throwing no further light on the subject.

The old constitution of Ohio having received this settled construction, a new one was adopted retaining the same provision as to color; and it was held in *Anderson v. Milliken*, (9 *Ohio State R.* 568), that it must be considered as having been adopted subject to the construction expressly given to it upon that head, and that voters need only have a predominance of white blood, because that had been fixed by the re-adoption of a construed clause.

But the same bench at the previous term, in *Van Camp v. Board of Education of Logan*, (9 *Ohio State R.* 406), held that the rule was not maintainable on any other ground, and refused to follow the old decisions any further.   They held that " colored persons," whether lighter or darker than mulattoes, had never been received or regarded as white by public sentiment, and should not be so held; and that the old decisions had never been able to satisfy the community, or to prevent the Legislature from considering the standard erroneous; and that they were evidently the result of a very natural

feeling, that some of the laws were discreditable and unjust. The very fact that it became necessary for the appellate court to repeat the same decisions so many times, is strong evidence that they were not acquiesced in as well founded; and shows the folly of attempting to assert by judicial authority that words mean what everybody knows they do not mean. It has, indeed, been considered a proper exercise of judicial courtesy to strain a point in favor of statutes, so as to give them a meaning which shall save their constitutionality; but, with that somewhat questionable exception, courts will always find it necessary to explain away fewer of their own words, when they fix a natural meaning upon the words of others, and leave the responsibility of every measure to fall where it belongs.

As the decisions now stand, so far as I have been able to follow them out, there is not a court in the United States which holds that a " colored person," in the popular acceptation, although lighter than a mulatto, can be called " white" without doing violence to language. In this State, both before and since the constitution now under consideration, the population of African descent has always been divided into *black, mulatto, and " other persons of color*," under statutes designed to protect them from illegal bondage; and every one must admit that statutes which protected none of a lighter shade than mulatto would have been of comparatively small service in that direction. (See *R. S.* 1838, *p.* 624; 2 *Comp. L.* § 5735; *L.* 1859, *p.* 526.) The term, "*persons of color*," was used in a very broad sense, and in conformity with popular usage, or it was senseless altogether.

If a man is not made white by a mere predominance of white blood, then the question arises, where is the line to be drawn, and how is the distinction to be ascertained? Rules of suffrage must be presumed uniform as far as possible. It must be admitted, therefore, that we are compelled to discover some mode of classification, and that persons of precisely the same blood must be treated alike, although they may differ in

their complexions. There are white men as dark as mulattoes, and there are pure blooded Albino Africans as white as the whitest Saxons. This classification is no doubt a difficult task, and there is room for much disagreement in it, because no rule can be applied without some inconvenience; but that will not justify us, I think, in refusing to assume the duty, and in holding those to be white who can be easily seen by every one to be otherwise. We are not, however, without some excellent guides upon the subject, in the Constitution and the laws which have governed our elections from the outset.

The Constitution does not impose any restriction of color, except upon electors. The aim of all election laws is to preserve the purity of elections by *prevention* of illegal voting as far as possible, so as to ensure a legal election as nearly as may be. The prevention of illegal voting has, until recently, always been mainly in the hands of inspectors of election; the registry system having been adopted long since the last Constitution. During a large portion of the time these inspectors have had no right to examine one claiming to be a qualified voter on oath, except as to certain facts entirely independent of his color; and under the statutes it would have been impossible for them to administer oaths to witnesses. · And it is apparent that if issues could be raised before them, and tried by witnesses, the trial of the first voter's qualifications might exhaust the time for the entire poll, and destroy the election. We held in *People v. Wattles*, (13 *Mich.* 446), that the statute requiring a person who would take a certain oath, to be allowed to vote, did not dispense with the pre-requisite of registration; and the former Supreme Court in *Gordon v. Farrar*, (2 *Doug.*, *Mich.* 411), held under a similar statute, entitling a person to vote who took an oath, having no reference to his color, that the inspectors must in some way or other be satisfied that he was white. As they could generally do this only by inspection, (not being able to obtain testimony,) we must assume that it was intended that the division of persons, into white and other than white, must have been designed

to reach those who, as classes, are apparently white, and likely to be so regarded by men generally. No scientific or technical test could be admissible, because the inspectors must usually be plain men of miscellaneous occupations. In some States the rule of determining blood by appearance has been held applicable to individual cases without classification; and in *Johnson v. Norwich*, (29 *Conn.* 407), this rule is referred to as having much to recommend it. The Supreme Court of Ohio, in *Gray's* case, acted upon a similar principle of judging of blood by appearances. But it seems necessary, in order to make the constitutional rule at all sensible and practicable, that any general classification must be based upon the distinction between those who as classes are apparently white, and those who are not. As all really legal voters should have their rights, the line must be so drawn as to include among the white all classes except those among whom persons apparently white are exceptional cases. And it remains to be seen whether any such division is feasible.

It will be found by inspection of vocabularies and books of reference that, among all the principal civilized nations which have had to deal with the African race, there have been but three well recognized divisions of pure and mixed blood, into blacks, mulattoes, and quadroons. None of these can be properly classified as white. Beyond this the division ceases to be general. The term "*Octoroon*" in the English language, except possibly as a scientific term, belongs to the department of sensation literature, and has not, until very recently, been adopted into any of the dictionaries. It does not appear in such works generally. It is fair to presume—and I think such is the general experience—that, while quadroons are in most cases easily distinguished as not white, persons having less than one-fourth African blood are often enough white in appearance to render any further classing difficult, and to require, in many instances, more than the usual knowledge of mankind to distinguish their mixed blood by inspection. The Virginia rule of presumptions, adopted in the last century,

when opinions had not become heated on this subject, fixed the line of quarter blood as the dividing standard. (*Dean v. Commonwealth*, 4 *Grattan*, 541; *Gentry v. McMinnis*, 3 *Dana*, 382). Judge Bouvier recognizes this as a prevalent rule. (1 *Bouv. Inst.* 70). It is a rule less likely to cause litigation or mistake than any other, and one which does no violence to the general understanding by including among whites any great number of evidently colored persons, while it is broad enough to admit all who have any reasonable claim to be called white.

I am of opinion that it should be considered, therefore, that persons are white within the meaning of our Constitution, in whom white blood so far preponderates that they have less than one-fourth of African blood; and that no other persons of African descent can be so regarded. As the defendant came very far within this rule, I think a new trial should be granted.

CHRISTIANCY and COOLEY JJ. concurred.

MARTIN CH. J. dissented, and stated that he would write out his views at a future day. The following opinion was subsequently prepared:

Dean was indicted, tried and convicted in the Circuit Court for Wayne county, for illegally voting at an election held at a regular township meeting in one of the townships of that county for township officers, and at the same time and place at a general election for members of the Board of Regents of the State University.

The bill of exceptions shows the following state of facts:

That Dean being a resident of the township offered to vote at said elections, and, upon being challenged, took the oath prescribed by law, that he was a resident of said township and possessed the other requisite qualifications of an elector; that he was of Indian descent, and not a member of any tribe; whereupon his vote was received and deposited in the ballot-

box and counted with other ballots deposited therein, according to law.

That thereupon the counsel for the People introduced as a witness, one Andrew P. Young, who being duly sworn, testified to the above facts; and further, that from the color and appearance of the defendant, he regarded him as a mulatto, and that he did not consider him a white man. The said counsel also introduced other witnesses, some from the State of Delaware, who testified that defendant was a mulatto; that he was not a white man; that he was born in the State of Delaware; that in Delaware they considered all persons of mixed white and African blood to be mulattoes; that they (the witnesses) could not state the proportion of white or African blood in the defendant; but they judged from his appearance that he was of such mixed blood, with a considerable proportion of negro blood in him, and therefore they understood him to be a mulatto; that they called by that title all who were not entirely of white or black blood. The said counsel for the People then introduced as a witness for the prosecution Zina Pitcher, who testified that he was a physician and surgeon, and had practiced as such for the last forty-three years; that he was acquainted with the races, Indian, Negro, Mulatto, etc.; that he had examined the prisoner on trial, and from such examination it was his professional opinion that there was some African blood in the defendant, but that it was very much diluted, not exceeding one-sixteenth part; that he should think the prisoner had one-sixteenth African blood in his veins; that the only clear indication of African blood is a peculiarity in the cartilages of the nose, and this was an infallible indication; that there was nothing about his appearance in other respects, except color, which indicated African blood; that his skin was not different from that often witnessed in Europeans of bilious temperament; that his hair had the structure of the Caucasian; that the hair is always either of the one race or the other, and in the mixed blood the hair alone would indicate only the one or other of the races; that

he was not a mulatto; a mulatto being a person of the half blood, and that the defendant was far from that; and that he was a white man, except such taint of African blood.

The counsel for the defendant then introduced witnesses, who were sworn, and testified that they had known the defendant and his family in Delaware; that they were of Indian descent, from the original Indians of Delaware, and that they had no negro blood in them to the knowledge of the witnesses; that they, the said witnesses, had never heard of such a thing.

Upon this state of facts the counsel for the defendant requested the Circuit Judge to charge the jury:

1st. That if they believed from the evidence that the defendant possessed the other requisite qualifications of a legal elector, yet that he had a trace of African blood in his veins, not exceeding one-sixteenth, while the rest was of the white race, he was a legal elector, and lawfully entitled to vote.

2d. That if they believed from the evidence that the defendant had all the other qualifications of an elector, and had in his veins a preponderance, more than one-half of the blood of the white race, he was a legal elector.

3d. That if they believed from the evidence that the defendant was of Indian descent, but had such a trace only, or portion of negro or African blood in his veins, he was a legal elector, as a person of "Indian descent," under the constitution, if they believed, from the same evidence, that he had all the other requisite qualifications.

And the said Circuit Judge then and there refused to charge the said jury as requested in each and every one of the said requests, to which said refusals to charge, and each and every one of them, the said counsel for the defendant then and there excepted, and the said Circuit Judge did then and there charge the said jury that, although the said defendant might possess all the other qualifications of an elector at said election, yet if they believed, from said evidence, that he had a portion of negro or African blood equal to one-sixteenth, as

testified to by Dr. Pitcher, he was not a white man and a legal elector, within the meaning of the state constitution, and was not entitled to vote. And if he knowingly and wilfully voted, at said election, knowing that he was not a white man, he should be convicted. To which said charge, so made, the counsel for the defendant then and there excepted. And the said Circuit Judge then and there further charged the said jury that if they believed, from the evidence, that said defendant possessed all the other qualifications of an elector, except being a white man, nevertheless if they believed, from the said evidence, that he was a person of Indian descent, possessing, however, a distinct and recognizable trace of negro or African blood, amounting to one-sixteenth, as was testified by Dr. Pitcher, he was not a white man, within the meaning of the constitution, and was not entitled to vote as a person of "Indian descent" under our constitution.

Upon all the exceptions taken error was assigned, and I think well assigned. I think there was manifest error in denying the requests to charge as asked by the defendant, and in the charge given. If Dean possessed the other requisite qualifications of an elector, yet had a strain of African blood in his veins, not exceeding one-sixteenth, whether the rest was of the white or the Indian race, we are all agreed that he was a legal elector. It is thus conceded by all the Court that a strain of African blood is not sufficient to disqualify one claiming the electoral rights. This, as my brother Campbell says, is decisive of this case.

But another question was raised, which my brethren have discussed to great extent, as they regarded it as the real question sought to be raised, and as I differ from them as to its proper solution, I shall consider it, but in as narrow a compass as possible, consistent with duty. It is this: If the defendant had in his veins a preponderance, more than one-half, of the blood of the white race, was he or not a legal elector? (I throw the question of Indian blood entirely aside, as of no interest in this discussion,) or what dilution of African blood

is requisite to make the possessor " white" so as to enable him to demand and enjoy the electoral franchise.

I agree with my brethren that up to the time of the adoption of our present constitution, (and I think it true up to the present time,) there was no generally prevalent legal meaning which can be regarded as having become so attached to the word " white" as to have been of any governing weight in its adoption into our constitution and laws. The origin of the regulation, confining the right to vote to *white males* in this state, has therefore very little weight with me in determining the value of the word " white" as employed in our constitution. The question is open. What does it mean as it is employed in that instrument? But I will for a moment consider that origin. It appears that it originated in the act of Congress of February, 1819, authorizing the election of a delegate to Congress from Michigan Territory, conferring the right to vote upon *free white male citizens* who had resided in the Territory a certain length of time, and paid taxes. Other acts of the Territory followed, fixing the same standard; and from these sources and the continued use of the phrase, it was, as I think, finally employed in the constitution, but with the loose, indefinite idea of its value and meaning which my brother Campbell has suggested. And in considering this origin we must not forget that it sprang up when slavery was a recognized and powerful institution in the country, overshadowing and to a vast degree controlling the Government, and the political sentiments of individuals of all parties. The predominant idea of that day was that white blood should govern and control our institutions, but the strain of blood which should divide the white and African races was not regarded—it was then of minor importance. This was universally true in the free states, and in the slave states no such question could arise, their peculiar institutions and laws preventing it. The regulation, which has been incorporated into our constitution, was continued, partly from this fact, that it already existed unexpounded, and partly from indifference,

as the questions respecting the *status* and rights of those possessing a strain of African blood less than the mulatto had not then become the subject of consideration, or political action. And at the time of the adoption of our present constitution, I do not think this question of degree of blood entered into the consideration of voters. They only determined that negroes should not vote, and this included, without doubt, mulattoes. If they went further than this, they intended to exclude every person in whose veins a single drop of African blood could be traced. It was not until sectional contests for power, the agitation of the question of the right to petition Congress for the abolition of slavery in the District of Columbia, and the agitation by a few persons in the northern states of the question of the justice and right of holding men in bondage, that the strong and bitter prejudice of color was excited in the north, amounting with a certain class to intense hatred toward all who were black, or possessed the least taint of African blood. These are feelings to which the originators of this regulation were entire strangers, and which, I hazard nothing in saying, they would have repelled with earnest indignation, and opposed—if not wholly prevented—by wholesome qualifications of this regulation, if they had been apprehended. And if they had done so, I have no doubt such qualifications would still remain in our constitution and laws, for the same reason that the word "white" remains unqualified. The question, how much, or how little African blood affects the political *status* of the posessor is, then, of comparatively modern origin, and up to this day is only agitated in the north. The position which will be taken in the late slave states is not yet made manifest. In no other country than ours has it, or will it arise. Is Alexander Dumas less a man for possessing a strain of negro blood, or would he be hustled from the polls, in France, for that cause? It has been left to freemen of a boasted free Government to excite this hatred of races, and deny to persons tainted with African blood the equality we boast all Americans are entitled to.

And to our shame be it said, this prejudice is of Northern origin—it never had ground or foothold in the slave states. Thus, as one example, the State of North Carolina, until about the year 1832, went further than the people of Michigan have ever been disposed to go; and by law provided that all free-men who had paid a public tax—*and free blacks were included in this category*—might claim and exercise the elective fran-chise. And, I am glad to say, the same right is extended to free blacks in the New England states, and in New York and New Jersey, and perhaps other Northern states—in some with, and in some without qualification. No prejudice of blood existed in the slave states, (as they were once called,) at the time this regulation was established in Michigan, nor do I think it does yet, except such as may result from the abolition of slavery, but in all their laws regulating the *status* of the black they were influenced only by considerations of pecu-niary interest, social security, and the acquisition and retention of political power. The negro, and those possessing negro blood, were regarded as chattels, if slaves, and treated as such; the free negro, as in North Carolina, being regarded as a man. It was left to northern men to arouse that prejudice and excite that hostility toward the colored race, and all having African blood, which we are now witnessing, and which we have for the past few years witnessed, and to which the South were strangers. And how? Not by expressing opinions which every freeman has the right to utter, but by the persistent efforts made to suppress that expression of opinion, and by engendering and fostering the bitterest prejudices both North and South against those who dared to speak as they thought, and by arousing the fears of the South for the safety of prop-erty, the security of families, and the preservation of political power.

There is no escaping this. This was the origin of that prej-udice of blood which exists at this day amongst us, and which is by some regarded as remarkable, and by others natural, but which is really the result of education and political train-

ing. If the blacks and those possessing a strain of African blood associate more closely with each other than with pure whites, it is because of this unnatural prejudice, and is no more anomalous than the closer affiliation of foreigners with those of their own nation. This association by black or white depends upon education and social sympathy.

This is the first occasion where the Supreme Court of this State has been called upon to construe the word "white" as used in the constitution, and I should regard myself derelict in duty, and unjustifiably regardless of the progress of general intelligence, and the progress of the age should I interpret it in a manner incompatible with such progress, unless compelled to by the irresistible conclusion, or the absolute evidence, that the people in employing it, had the distinction of color to the slightest shade, or the liveliest notion of prejudice toward African blood, however much diluted, active in their minds. This I do not believe. That they intended that no black or mulatto should vote, I have no doubt, but beyond this I think there was no thought. They certainly had none that a person of less than quarter blood had or would have a superior right to vote, over one possessing a preponderance of white blood; and they must have intended that the least strain of African blood should disqualify the possessor, or that a preponderance of white blood should confer the electoral right, in other words, embrace him within the catagory of white citizens. I see no way of escaping this conclusion, nor of establishing any other rule, except by judicial legislation. To my mind, it is inevitable that we must take one or the other horn of the dilemma.

By what authority of law, or principle of reason can we fix a strain of one-eighth, one-sixteenth, or one-thirty-second of African blood as a standard of caste, so as to make a man white or black, as he happens to have more or less, and thereby admit or exclude him from the full rights of citizenship? How can a court of justice thus usurp legislative power, and introduce an arbitrary and artificial test, depending upon the

proportion of mixed bloods in the person claiming the right to vote? The reasoning of my brethren shows to my mind conclusively that these things cannot be done, that the attempt to fix an intermediate standard is an attempt to legislate, and it is not sustained by the arguments they have employed. It will be observed that the constitution of this state contains no *express* prohibition to black or colored persons voting. It only declares who may vote, and these classes of blacks and colored are not mentioned. Had "colored" persons been excluded by express words, a fair and perhaps conclusive argument might be made against the right of any one having the least strain of African blood in his veins to vote. But the words "white male," etc., are the only words employed, and these are employed to denote the sex and the blood, rather than the color of such as may be voters. Unquestionably it was intended by the use of the word "white" to exclude blacks from the privilege of voting, and I think this embraces mulattoes also, for they are neither white nor black; no preponderance of the blood of either race existing. But the case is different where there is a preponderance of either blood, and clearly so where that preponderance is of the paternal strain. As none but males are allowed to vote, the right to the exercise of the electoral franchise is acquired through the father; and when his strain of blood preponderates, as if he be pure white, or less than half African, then all the rights of citizenship which he possesses are transmitted to his offspring. All will concede that if a white American male citizen intermarries with a female of foreign birth, whether at home or abroad, or with an Indian woman, the children born of such marriage are American citizens to the fullest extent, and entitled to all the rights of citizenship possessed by the father. This is the universal rule. The only exception I know of, to this general rule, is to be found in the *status* of the slave, and this exception is apparent not real. There was no lawful wedlock between white and colored persons in the so-called slave states. Every child of color, born of a slave mother was a

14 MICH.—2 L.

slave—regarded only as a subject for servitude, or for sale in the market. They were really chattels, and hence the established rule in those states regarding this class of persons was —*partus sequitur ventrem*. With the abolition of slavery this rule must fall to the ground, for the reason it no longer exists. But even in those states as liberal a view of the rights of the colored persons was entertained, and recognized by law, as is by my brethren in this case. The standard established by slavery to distinguish the freeman from the slave, is precisely that which the majority of this court have adopted to distinguish the white from the African—the voter from the non-voter; for the person seeking to vote must be of the one or the other descent. In other words: I find in our Constitution no recognition of grade or degree of admixture of blood, intermediate the two,—and I repeat again, that to my mind a preponderance of blood must control, or absolute purity of white blood be required. The law of Kentucky and Virginia was, and for anything that I can find, still is, that being a white person, or having less than one-fourth of African blood, is *prima facie* evidence of freedom. — (3 *Dana*, 382; 4 *Grattan*, 541.) In a free state this rule would make the person white by the judgment of my brethren. This was the rule of chattels. Can we not at this day, and in a free state, rise above this rule of slavery and occupy a still more liberal and humane ground? But we are not without the authority of the court of at least one free state—and I think the only one in which this question has been distinctly raised and adjudged,—the state of Ohio. The views of my brethren and myself differ so widely upon the condition of the law in that state, that I shall examine the decisions of her Supreme Court with some care, and endeavor to show that the rule established by her courts, is precisely that for which I contend. The first case in that state, in which this question of blood arose, was that of *Gray v. The State*, (4 *Ohio*, 353). Polly Gray was indicted for robbery, and the prosecuting attorney called to the stand a negro as a witness in behalf of the state. The counsel for the prisoner objected

to his admission, on the ground of incompetency under the statute regulating black and mulatto persons. The prisoner was of a shade of color between the white and mulatto. The witness was admitted to testify and exception taken. Here was the clear question presented whether a person of a shade of color between the white and mulatto was to be regarded as a " white" person—and the Supreme Court resolved it affirmatively. The court says : " The statute compels courts of justice to reject black and mulatto witnesses, where a white person is a party. The statute is one which a court is called upon to execute with reluctance, yet when a case is presented, the court has no alternative but to yield to the expression of the legislative will. Three descriptions of persons are designated by name in the statute, white, black and mulatto—and these three are well known by the same terms in common life; but we doubt whether we can refine upon these obvious distinctions, or whether good policy or good sense requires us to raise the necessity for further discrimination. We are unable to set out any other plain and obvious line or mark between the different races; color alone is insufficient. We believe that a man of a race nearer white than a mulatto is admissible as a witness, and should partake in the privileges of whites. We are of opinion that a party of such blood is entitled to the privileges of whites, partly because we are unwilling to extend the disabilities of the statute further than its letter requires, and partly from the difficulty of defining, and of ascertaining the degree of duskiness which renders a person liable to such disabilities."

This is the leading opinion in the courts of Ohio upon this question of blood, and has been ever since followed and cited with approbation to the present day. The case commends itself, I think, to the judgment of all; its position is sound, and its reasoning good. I see no evidence of any thing but mature deliberation in it, although it is not elaborated with a flood of words. This could not be expected, as it was one of first impression; and the result of careful deliberation announced

is worth more than volumes of argument to show by what process of reasoning the judgment was reached.

This case was followed by that of *Williams v. Directors of School District, No.* 6, where the plaintiff declared in case against the defendants for excluding his children from school. The record showed the defense relied on to be, that the plaintiff was quarter negro; and the mother of the children, his wife, a white woman. In this case, that of Polly Gray was relied upon and adhered to.    Judge Lane, in giving the opinion of the court, says: "We think the term 'white,' as used in the law, describes *blood* and not *complexion*, and are satisfied with the construction heretofore given.    The plaintiff's children are therefore white, within the meaning of the law."

This case was followed by *Jeffries v. Ankeny, et al.*, 11 *Ohio*, 372 — where the same question was raised — and the judgment in the case of Polly Gray reaffirmed and adopted; and this case, and that of *Williams v. Directors, etc., supra*, construed to hold that "all nearer white than black, or of the grade between the mulatto and the white, were entitled to enjoy every political and social privilege of white citizens; that no other rule could be adopted, so intelligible and so practicable as this; and that further refinements would lead to inconvenience, and to no good result."    The cases of *Thatcher v. Hawks*, 11 *Ohio*, 376, and *Chalmers v. Stewart*, 11 *Ohio*, 386, reaffirm the same construction of the word "white."    The same construction was again reaffirmed in the case of *Lane v. Baker and others*, 12 *Ohio*, 237, and in *Steward v. Southard*, 17 *Ohio*, 402.    The next case, and it is the one upon which my brethren seem most strongly to have relied in arriving at the judgment in this case, is that of *Van Camp v. The Board of Education of Logan*, 9 *Ohio, State R.* 406.    In this case the majority of the court held that the statute to provide for the re-organization, supervision and maintenance of common schools is a law of *classification*, and not of *exclusion;* and that children of three-eighths African

and five-eighths white blood, but who are distinctly colored, and generally treated and regarded as colored children by the community where they reside, are not *as of right* entitled to admission into the common schools set apart under the act for the instruction of white youths. The act in question provides for the education of *all* the children within the state; but in so doing divides them into two classes, white and colored, and imposes the duty of providing schools for both classes, though under different teachers, upon the same board of education. I have examined this case with great care, and I can find but one ground upon which the opinion of the majority of the court is founded, viz: prejudice of blood and the present state of public feeling. This idea underlies the whole case, and a youth of five-eighths white is excluded from the white schools because he is *regarded* in the community where he lives as *colored*, and a prejudice exists toward his class. Read the opinion of a majority, and we will find no other principle controlling the court, or inducing the judgment. A more unjudicial ground was never taken by a court. It is not pretended that the children excluded were not "white" within the authority of former decisions, but that as this was a law of *classification*, and not of *exclusion*, the prejudices of the community must control the law and determine to what school the child should be sent. He was white enough to be a freeman, and when of age to vote; but not white enough to attend the common school provided for white children. For this opinion I have no respect. From it the Chief Justice and Judge Sutliff dissented, the latter giving a most able and conclusive opinion exposing its fallacy and utter weakness. But, as bearing upon the question before us, and to show that the principle involved in the case at bar was not involved, or regarded as affected by that decision, and to show the abundant caution with which the majority of that court trod upon this ground of mixture of blood, they take the precaution to say that "there is no such incongruity in excluding light mulattoes from the white schools, and permitting them to participate in elections as the

counsel for the plaintiff seems to suppose." Subsequent to this case, and what is now the ruling authority of Ohio, is that of *Anderson v. Milliken*, 9 *Ohio State R.* 568. This was an action by the plaintiff against the defendants, judges of an election, for the refusal of his vote. The father of the plaintiff was a white man, and the mother had an admixture of three-fourths white and one-fourth African blood, and it was unanimously held that persons having a mixture of African blood, but a preponderance of white blood, or being more white than black, and being otherwise qualified, are voters, and the adjudications of the courts from the case of *Polly Gray* down to, but not including *Van Camp v. The Board of Education*, which appears to have been referred to with no expression of approbation, are cited in support of the judgment. This authority has never been overturned, and is now the settled rule, and final judgment of the courts of that state upon this question. If I had not already extended this opinion beyond usual limits, I should be glad to refer to the case of *Anderson v. Milliken* at greater length. It occupies the full ground for which I contend, and unequivocally holds, and clearly demonstrates, that a preponderance of white blood makes the possessor white, within the meaning and letter of the constitution of the State of Ohio, which is the same as that of Michigan in this respect, and secures to him the full rights of citizenship.

I need hardly refer to the facts of the case at bar to show the absurdity of any other rule, or of the attempt by judicial action to fix an artificial line of demarkation between black and white. The very necessity of calling in Dr. Pitcher, and having an examination of Dean's nose, to ascertain whether he had black blood in his veins, and thereby determine his right to vote, affords a sufficient commentary upon the rule my brethren have established. If this be the correct rule, we had better have the Constitution amended, with all speed, so as to authorize the election or appointment of nose pullers,

or nose inspectors, to attend the election polls in every township and ward of the state, to prevent illegal voting.

I hold that a preponderance of blood decides the question of the right to vote under the Constitution, and that within the letter and meaning of that instrument, Dean was white, and would have been, had he possessed much more African blood than he is shown to have had.