ARMCO STEEL CORPORATION *v.*
DEPARTMENT OF REVENUE.

1. TAXATION—ADJUSTED RECEIPTS TAX.

    The adjusted receipts tax is a tax on Michigan activities measured, in amount by adjusted receipts derived from or attributable to Michigan sources, such tax being measured by all of the adjusted receipts if business transactions occur entirely in Michigan, but, if business transactions occur partly within and partly without this State, an apportionment formula is utilized, hence, the tax is neither a gross receipts tax nor a tax on the privilege of doing interstate business in this State (PA 1953, No 150, as amended by PA 1954, No 17, and PA 1955, No 282).

2. CONSTITUTIONAL LAW—INTERSTATE COMMERCE—PERMITTED STATE TAXATION.

    The commerce clause of the Constitution of the United States, giving exclusive power to congress to regulate interstate commerce, permits the levying by a State of taxes (1) upon net in-

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 7, 8, 9]  27 Am Jur, Income Taxes § 24.
    Income tax on nonresident or on foreign corporation.  15 ALR 1326; 90 ALR 484; 156 ALR 1370.
[3, 4, 6, 13]  27 Am Jur, Income Taxes § 193.
    Allocation to State of income of foreign corporation derived from sources within State.  90 ALR 490; 156 ALR 1384.
[5]  27 Am Jur, Income Taxes § 227.

come of business engaged in interstate commerce where portion of net income taxed is reasonably apportioned as to the taxing State, and (2) upon interstate commerce or gross receipts therefrom but reasonably related to requiring interstate commerce to pay its own way in the taxing State (US Const, art 1, § 8).

3. TAXATION—ADJUSTED RECEIPTS—FOREIGN CORPORATION—ACTIVITIES IN STATE.

Continuous and systematic activities of plaintiff steel fabricator, a foreign corporation not admitted to do business herein, by its several full-time employees in this State and numerous special purpose agents and employees brought into this State as occasion arose to assist salesmen in development of markets, to service orders in various ways, and to adjust complaints in this State, formed a proper basis for imposing an adjusted receipts tax reasonably apportioned pursuant to statutory formula (PA 1953, No 150, as amended by PA 1954, No 17, and PA 1955, No 282).

4. SAME—STATE INCOME TAX—INTERSTATE COMMERCE—APPORTIONMENT—DEFINITIONS.

A State tax upon the net income of a person or foreign corporation doing business partly within and partly without the State, reasonably apportioned to the activities of the taxpayer within the State, does not violate the commerce clause of the Constitution of the United States merely because of differences in details in definitions of deductions or exemptions, or differences in such details from time to time (US Const, art 1, § 8; PA 1953, No 150, as last amended by PA 1955, No 282).

5. SAME—ADJUSTED RECEIPTS—APPORTIONMENT—BURDEN OF PROOF.

A taxpayer doing business partly within and partly without this State who attacks the statutory formula of apportionment of the adjusted receipts tax has the burden of showing that it results in extraterritorial values being taxed (PA 1953, No 150, as last amended by PA 1955, No 282).

6. SAME—ADJUSTED RECEIPTS—APPORTIONMENT—INTERSTATE COMMERCE.

Adjusted receipts tax of 1/10 of 1% of the total business in this State of foreign corporation doing business partly within and partly without this State, and levied pursuant to statutory formula, *held,* to bear a real and reasonable relationship to the privileges, opportunities, and protection plaintiff enjoyed

in conducting its interstate business in this State (PA 1953, No 150, as last amended by PA 1955, No 282).

7. SAME—INTERSTATE COMMERCE.

It is not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of the State tax burden even though it increases the cost of doing business, as interstate business must pay its way (US Const, art 1, § 8).

8. SAME—ADJUSTED RECEIPTS—APPORTIONMENT—INTERSTATE COMMERCE—DUE PROCESS.

A State tax upon the adjusted receipts of a foreign corporation, computed at a nondiscriminatory rate on that portion of its receipts reasonably attributable to its business activities in the taxing State, does not violate either the commerce or due process clauses of the Constitution of the United States (US Const, art 1, § 8; am 14; PA 1953, No 150, as last amended by PA 1955, No 282).

9. SAME—ADJUSTED RECEIPTS—APPORTIONMENT—INTERSTATE COMMERCE.

The State adjusted receipts tax, as levied upon steel fabricator, a foreign corporation doing business partly within and partly without this State pursuant to statutory formula for apportionment, held, valid, since (1) there is no direct restriction on interstate commerce, (2) the tax is not imposed on persons coming into the State for a temporary purpose, (3) the tax is not laid on the privilege or right of engaging in interstate commerce in this State, (4) the tax is nondiscriminatory as to business activities within this State or attributable to it by providing a commercial advantage to local business, (5) the tax is not a regulation of any kind, (6) the tax does not compel the corporation to pay for the privilege of engaging in interstate commerce, (7) the tax does not appear to result in multiple taxation, (8) the tax is reasonably apportioned, (9) the tax is a constitutionally fair demand for that aspect of interstate commerce to which this State bears a special relation (US Const, art 1, § 8; am 14; PA 1953, No 150, as amended by PA 1954, No 17, and PA 1955, No 282).

10. SAME—ADJUSTED RECEIPTS—STATEMENT OF TAX—CONSTITUTION OF THE UNITED STATES.

The provision of the State Constitution, requiring that a taxing act distinctly state the tax, was not violated by reason of clause in adjusted receipts tax act exempting that which the State may not tax under the Constitution of the United

States, such provision being a recognition within the statute of the State's limitation with respect to imposing a tax violative of the latter Constitution (Const 1908, art 10, § 6; PA 1953, No 150, § 4, as amended by PA 1954, No 17).

11. SAME—ADJUSTED RECEIPTS—STATEMENT OF TAX—RULES AS TO DEDUCTIONS—FEDERAL INTERNAL REVENUE RULINGS.

Provision of State Constitution requiring that a taxing act shall distinctly state the tax was not violated by provision of adjusted receipts tax act that the administering agency, in promulgating rules governing deductions, should follow, where not in consistent with the act, the rulings of the Federal internal revenue bureau with respect to income tax, since the governing rules are those of an administrative agency of this State, within the limitations fixed by statute (Const 1908, art 10, § 6; PA 1953, No 150, § 19, as amended by PA 1955, No 282).

12. SAME—ADJUSTED RECEIPTS—STATUTES—COMPUTATION OF TAX.

Provisions of adjusted receipts tax act relative to rate and formula for computation of the tax *held,* to set forth a tax that was computable well within the competence of the administrative agency and taxpayers generally affected thereby as against claim of foreign corporation that the statute failed to state the tax distinctly as required by the Constitution (Const 1908, art 10, § 6; PA 1953, No 150, §§ 2, 3, as amended by PA 1954, No 17, and PA 1955, No 282).

13. SAME—ADJUSTED RECEIPTS—APPORTIONMENT FORMULA—GROSS RECEIPTS.

Application of statutory formula for determination of adjusted receipts tax of foreign corporation whose business transactions were partly within and partly without the State, whereby the amount of gross receipts was arrived at by deducting statutory deductions from entire receipts, rather than from Michigan sales only *held,* proper, since to use the latter could result in an unequal share of the tax burden, and the legis lative intent appears to have been to levy a tax equally on all income derived by taxpayers attributable to Michigan sources (PA 1953, No 150, § 1, as amended by PA 1954, No 17, and PA 1955, No 282).

14. COSTS—PUBLIC QUESTION—ADJUSTED RECEIPTS TAX—FOREIGN CORPORATIONS.

No costs are allowed in assumpsit action by foreign corporation whose business transactions were partly within and partly without the State, to recover adjusted receipts taxes paid

under protest, where public questions are involved (PA 1953, No 150, as amended by PA 1954, No 17, and PA 1955, No 282).

Appeal from Wayne; Bowles (George E.), J. Submitted October 14, 1959. (Docket No. 76, Calendar No. 48,148.) Decided April 11, 1960.

Assumpsit by Armco Steel Corporation, an Ohio corporation, against the State of Michigan, Department of Revenue, and Louis M. Nims, commissioner, for taxes paid under protest. Summary judgment for defendants. Plaintiff appeals. Affirmed.

*Dykema, Jones, Wheat, Spencer & Goodnow,* for plaintiff.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, *T. Carl Holbrook, Maurice Barbour,* and *William D. Dexter,* Assistants Attorney General, for defendants.

DETHMERS, C. J. Plaintiff sued to recover business activities taxes paid under protest. This is its appeal from summary judgment of no cause for action.

It is plaintiff's position that the trial court erred in entering judgment for defendants because:

"1. The only activities of plaintiff in Michigan are integral and inseparable incidents of interstate commerce and consequently plaintiff's receipts are solely derived from or attributable to either intrastate activities wholly without Michigan or to interstate commerce.

"2. The tax under consideration is in operation and effect the equivalent of a tax on gross receipts and is therefore a direct tax on interstate commerce. Furthermore the tax exposes plaintiff's receipts from interstate commerce to a multiple burden. Such a

direct and multiple burden is forbidden by the commerce clause of the Federal Constitution.

"3. Even assuming that the tax in question is a tax on local activity, and further assuming that plaintiff's activity in Michigan is 'local' in nature, the manner in which the tax is applied to the plaintiff does not limit the tax to Michigan activity but results in a substantial tax on activities taking place outside of the State of Michigan contrary to guarantees of due process.

"4. The tax violates the Michigan Constitution by failing to distinctly state the tax and by requiring reference to other law.

"5. Finally, without regard to the foregoing constitutional objections, the department of revenue has incorrectly construed and applied the phrase 'gross receipts' to mean the entire receipts of plaintiff *everywhere,* instead of its entire receipts *derived from its activities in Michigan."*

Plaintiff's declaration with attached exhibits, defendants' answer, plaintiff's reply, affidavits in support of defendants' motion for summary judgment with attached exhibits, and plaintiff's affidavit of merits filed in opposition thereto, are the sources from which the facts are to be gleaned. As set forth in those sources, the undisputed, pertinent facts, and the allegations of material facts, necessary to decision herein, which, though disputed by defendants, favor plaintiff, are as follows:

Plaintiff is an Ohio corporation with its principal place of business there. It is engaged in the production, manufacture, and sales of various types of steel and steel products. All of its production and manufacture, from the smelting of ore through fabrication of steel and steel products and storing of same, occur outside of Michigan. Plaintiff has not been qualified to do business in Michigan, although defendants claim that it should have been. It has a sales office in Detroit and a branch office in Grand Rapids, which

plaintiff alleges are maintained solely for convenience in the solicitation of orders for its products. It maintains a bank account in Michigan for the convenience of the operations of the 2 offices. It employs in Michigan 5 salesmen, who solicit orders for its products in this State, and 8 clerks, in the 2 offices, who facilitate the work of the salesmen and process the orders obtained by them. It has more than 31,000 employees. Its Michigan payroll is less than 1/10 of 1% of its total payroll. The total value of its property in Michigan is less than 1/40,000 of its total property. Orders from Michigan are accepted or rejected at the home office in Ohio. Its sales to Michigan customers are shipped f.o.b. points outside this State, and payments by them are made to plaintiff at its Ohio offices. During 1954 and 1955, the period here involved, plaintiff's receipts from all sources were $1,036,764,419.13 and those from sales in Michigan $91,038,459.21.

Plaintiff's 5 Michigan salesmen not only solicit orders for its products, but they also discuss adjustments with customers for malfunctioning of its steel deliveries, involving less than 1% of its sales here. They are in charge of and responsible to plaintiff's district sales manager in this State, who reports to an area manager in Ohio. Under the district sales manager there is an office manager in Detroit, who is in charge of the general work in the 2 offices and of the clerical aspects of processing Michigan orders and handling related correspondence.

Included in the duties and responsibilities of plaintiff's district sales manager in Michigan are the following: To serve the customer's interests, to direct plaintiff's activities in the Detroit area, to act in a consulting capacity, to assume managerial responsibilities, to direct and coordinate activities of sales personnel in an effort to carry out effectively and efficiently management requests pertaining to the

securing of profitable business in Michigan, to promote and protect the best interests of plaintiff, to provide proper and adequate leadership, to keep his immediate superior informed of any unusual changes made by customers and competition which may affect plaintiff's overall position in the industry, including prices, expansion, strikes, changes in personnel, new products and grades, et cetera, to develop and maintain a harmonious working staff to work with customers and the home office, to build up customer relationships, to endeavor to operate within the budget, with especial emphasis on controllable items, to direct performance of assignments and responsibilities delegated by management, to resolve claims and complaints, to help plan sales programs, to analyze customers' needs in relation to patterns and determine the distribution of allotted tonnages, to report and resolve matters of price, quality, practices and methods not considered ordinary or competitive, to observe and report trends of commercial, industrial or economic nature as may affect or influence future business levels and plaintiff's planning, to maintain and develop contacts other than of a straight sales nature that may be of benefit to plaintiff, at times to accompany salesmen on customer calls and customers on calls to the home office, to set up budgets and disburse moneys for traveling expenses of salesmen, et cetera.   He is not required to be a salesman or to solicit orders.

The Detroit office manager is under the sales manager.   He is responsible for the prompt and accurate execution of all work involved in handling inquiries, quotations, entry, and service of orders, and general service to customers and district office personnel. This includes direct supervision of some 7 or 8 persons who are under the indirect supervision of the district sales manager.   It also entails the responsibility for the accuracy of records in the office

on quotas, status of orders, et cetera, and of files, such as pending claims, correspondence and the like, visualizer, order books, tonnage, and various other records, including salesmen's call reports and general information in regard to customer packaging and traffic problems.

The role of plaintiff's Michigan salesmen is extensive. Existing customers of plaintiff in Michigan are assigned to individual salesmen. Each salesman is generally given a specific territory in which existing customers are located, to the end that all the area of the State of Michigan and all existing customers are assigned and served by sales personnel of plaintiff. Approximately 40% of the time of the salesmen is spent in the district office, answering inquiries of the customers assigned to them and adjusting, processing, correcting, and screening customers' orders. The remaining time of the salesmen is spent in making calls on customers assigned to them at the customers' places of business. The salesmen's service activities include processing order changes; handling quality problems; investigating into customers' claims and complaints; negotiating settlement of such claims and complaints; assisting the customer and other personnel of plaintiff by arranging for mill representatives, sales engineers, metallurgists, research personnel, market development personnel, and credit representatives to visit the customer and give specialized help; and providing technical information to customers' research or metallurgical personnel, which the salesmen secure from plaintiff's technical personnel at plaintiff's mill locations or its home office in Middletown, Ohio. The activity of plaintiff's salesmen in providing these services to customers assigned to them is discharged primarily by regular, routine, and systematic calls on the customers at the locations where the customers are using the plaintiff's products. Plaintiff's sales-

men make general, routine contacts with the customers to handle specific problems or complaints and to get commitments for orders on a continuing basis and in handling complaints and problems in connection with processing orders in their offices.

Both in connection with the ordering of steel to make new parts, and in connection with claims of Michigan customers, mill representatives are frequently in Michigan. The mill representatives have special technical knowledge of the physical characteristics and qualities of plaintiff's products and their application to particular uses. The activities of such representatives of plaintiff in Michigan are solely an aid to plaintiff's sales efforts. If there is a complaint, for instance, that a given shipment of steel did not perform as specified, the salesman would request assistance from the mill, whereupon a mill representative would accompany the salesman to the customer's plant to investigate the complaint and to determine whether it was justified. If the mill representative should conclude that the complaint was justified, so that an adjustment was indicated, the decision as to the type of adjustment to be made and the amount of the same would uniformly be made in Middletown, Ohio.

Product managers also come into Michigan. The duties and responsibilities of these personnel are primarily centered around special sales effort and technical assistance to stimulate and promote the sale of a specific product. In carrying out these responsibilities, the product managers, being more familiar with the particular problems of a particular product, are called in on quality and application problems in an advisory capacity by salesmen at present and future customers' locations, including Michigan.

Various executive personnel, such as the vice president in charge of distribution, general manager of the sales division, and area sales managers of appel-

lant contact Michigan customers from time to time on such situations as negotiation of allotments, potential steel requirements of customers, advance commitments of customers for use of plaintiff's products, disposition of quality problems warranting top-level consideration because of the magnitude, and for future planning and projection purposes, including determination of future sales policy, the capacity and limitation of mills, and the problem of maintaining plaintiff's position in the market or industry, both within and without the State of Michigan.

Market development division personnel come into Michigan to gather statistical and other information regarding a particular product or industry in order that plaintiff's management can key their current and potential production capacities to changing market conditions.

Research division personnel make various visitations to Michigan customers for the purpose of coordinating certain research projects with customers' needs; assisting customers in certain applications of plaintiff's products; observing and advising on trends being made on products sold by plaintiff; and giving technical assistance, when necessary, in the solution of production and quality problems, including establishing proper testing methods, of other divisions of plaintiff, including market development and sales.

Operating division personnel visit customers of plaintiff in this State on various quality problems and methods of application of plaintiff's steel products. In addition, various operating division executives, such as the vice president in charge of operations, administrative assistant to the vice president in charge of operations, and mill, or works, managers, have made visits to Michigan customers to familiarize themselves and to assist the customers on various methods of application, on future planning and ex-

pansion of facilities, mill limitations, and various other operating policies.

Various visits have been made by the credit manager of the treasury division to customers in Michigan to review the financial condition of the customer and obtain the potentiality of customers for the purpose of credit extension.

Traffic division personnel visit Michigan from time to time to investigate and contact customers with reference to traffic and shipping problems, including questions of responsibility of damaged shipments, new methods of shipping, packaging, and handling plaintiff's steel products.

The activities of all the above referred to personnel in this State are generally at the request of and subject to the direction and control of the Detroit district office where they are coordinated and implemented by various office personnel of the plaintiff who carry on their activities in the Detroit district office.

All of the orders obtained by plaintiff from its Michigan customers involve activity of plaintiff's employees in this State. Orders are processed and screened through the Detroit district office on such items as tonnage allotments, loading and shipping data, promises of delivery dates, credit information, specifications, and other information required to properly process an order through the sales service department of the sales division of plaintiff located in Middletown, Ohio. Routinely, orders sent in by customers do not contain many of the items of information essential to the processing of such orders through the sales service department. The information on a customer's order, together with other information necessary to complete such order, are routinely copied on a uniform yellow worksheet, which is the paper processed by plaintiff's sales service department rather than the incompleted order of the customer. The information not appearing on an

order sent in by a customer, with the exception of the date of delivery promises, is contained on what is known as a "visualizer" in the Detroit office. Each order is completed and screened in this manner through the Detroit district office prior to transmittal to the sales service department of plaintiff at Middletown, Ohio. If an order contains information not in agreement with information appearing on the "visualizer," the order is either corrected and processed or it is rejected and returned to the customer, depending on the nature or extent of the discrepancy. If, for example, a problem in regard to delivery date or specification is involved and personnel in the Detroit office believe it can be cleared with the customer, the customer will be contacted and the order will be changed accordingly and processed. If the order calls for a product that is not available because of the lack of steel or because plaintiff is not in a position to fill that order because of prior commitments or the limitations of its mills, the order is automatically rejected.

The activity of all of plaintiff's personnel in this State is directly related to plaintiff's ability to have, establish, and maintain in this State a market for its products. Much of the activity of plaintiff in this State is not directly related to the solicitation of any particular orders for any of plaintiff's products. Plaintiff's salesmen do not routinely solicit specific orders but spend their time in making general, routine contacts with the customers to handle specific problems or complaints and to get commitments for orders on a continuing basis.

The lower court concluded that plaintiff carries on continuously a systematic and regular activity, utilizing the State of Michigan as one of the markets for its products; that some of the activity here in Michigan takes place before the interstate movement of plaintiff's products, and some afterwards. The

court further concluded that in necessary result the business activities tax here reaches income-producing transactions in the State of Michigan; that there is a sufficient activity here in the State to establish jurisdictional presence for tax purposes, and that the formula used, since it attempts to reach only that portion which is attributable to Michigan activity, contravenes neither the due process nor commerce clauses of the Federal Constitution.

The time here involved is 1954–1955. In effect during that period was PA 1953, No 150, as originally enacted (Stat Ann 1953 Cum Supp § 7.557[1] *et seq.*), then as amended by PA 1954, No 17, effective March 12, 1954 (CLS 1954, § 205.551 *et seq.*), and, finally, as amended by PA 1955, No 282, effective July 1, 1955 (CLS 1956, § 205.551 *et seq.* [Stat Ann 1955 Cum Supp § 7.557(1) *et seq.*]). The title announces it to be "An act to provide for the raising of additional public revenue by prescribing certain *specific taxes on income* * * * ." The act provides that the terms "income" and "adjusted receipts" are used therein interchangeably and that they shall be the gross receipts from business, including sales, less specified deductions, consisting of certain costs of conducting business, or, if such deductions do not constitute at least 50% of the gross receipts, then less a 50% deduction. The definition of "gross receipts" includes the entire receipts from any sales, whether made in inter- or intrastate commerce. A number of exemptions from the tax are provided, including the first $10,000 of adjusted receipts, and anything which the State is expressly or impliedly prohibited from taxing by the Constitution of the United States.

With respect to adjusted receipts or income of the business of persons engaging in any activity in Michigan a tax of 4 mills was laid on such adjusted receipts allocated to Michigan or, under later amend-

ment, 6–1/2 mills on adjusted receipts derived from or attributable to Michigan sources. The act, as last amended, provides that adjusted receipts derived from or attributable to Michigan sources shall be taken to be (1) the entire adjusted receipts of a taxpayer whose business transactions take place entirely within the State, but, (2) in the case of a taxpayer whose business transactions occur partially within and partially without this State, only that portion of his adjusted receipts obtained by applying thereto the following apportionment formula, viz., the average of the following 3 percentages, separately computed: (1) ratio of taxpayer's Michigan property to all of his property, (2) ratio of wages paid by taxpayer in Michigan to wages he paid everywhere, and (3) ratio of his gross receipts from Michigan sales to those obtained from sales everywhere. Before the 1955 amendment a different formula was applied. The amendments are not significant to the constitutional questions here involved.

This tax is part of a general scheme of State taxation of business activities in Michigan. It is a tax on Michigan activities measured, in amount, by adjusted receipts derived from or attributable to Michigan sources, which, as above noted, in the case of a taxpayer whose business transactions occur entirely within Michigan, means his entire adjusted receipts, but, if his business transactions occur partly within and partly without this State, means the sum reached by applying to his adjusted receipts the mentioned apportionment formula. It is, therefore, not a gross receipts tax. Neither is it, as hereinafter considered, a tax on the privilege of doing interstate business in Michigan.

Is the interstate commerce clause, US Const, art 1, § 8, offended by this tax as applied to plaintiff's business activities? An excellent listing and classification of the leading decisions of the United States su-

preme court in this general area are to be found in Mr. Justice EDWARDS' opinion in *Duluth, South Shore & Atlantic R. Co.* v. *Corporation & Securities Commission,* 353 Mich 636, on pages 655, 656 and 657, examination of which is invaluable to consideration of the problem before us.   Pertinent from that opinion is the following:

"On the other hand, the same court [United States supreme court] has upheld as not offending the commerce clause State taxes in at least the following classifications:   *    *    *

"(2) Taxes levied upon net income of business engaged in interstate commerce where the portion of net income taxed was reasonably apportioned as to the taxing State. *United States Glue Co.* v. *Town of Oak Creek,* 247 US 321 (38 S Ct 499, 62 L ed 1135, Ann Cas 1918E, 748); *Underwood Typewriter Co.* v. *Chamberlain,* 254 US 113 (41 S Ct 45, 65 L ed 165); *Bass, Ratcliff & Gretton, Limited,* v. *State Tax Commission,* 266 US 271 (45 S Ct 82, 69 L ed 282).

"(3) Taxes levied directly upon interstate commerce (or gross receipts therefrom) but held reasonably related to occasioning interstate commerce to pay its own way in the taxing State. *Postal Telegraph Cable Co.* v. *City of Richmond,* 249 US 252 (39 S Ct 265, 63 L ed 590); *Interstate Busses Corporation* v. *Blodgett,* 276 US 245 (48 S Ct 230, 72 L ed 551); *Western Live Stock* v. *Bureau of Revenue of New Mexico,* 303 US 250, see cases cited, p 254 (58 S Ct 546, 82 L ed 823, 115 ALR 944)."

Plaintiff's continuous and systematic Michigan activities in developing and using this State as a market for its product and the functions of its salesmen, all as above outlined, clearly distinguish this from the long line of drummer cases invalidating imposition by States or municipalities of a license tax on drummers for the privilege of soliciting orders for interstate business, such as *Robbins* v. *Shelby County Taxing District,* 120 US 489 (7 S Ct 592, 30 L ed

694), *Memphis Steam Laundry* v. *Stone,* 342 US 389 (72 S Ct 424, 96 L ed 436), and *Nippert* v. *Richmond,* 327 US 416 (66 S Ct 586, 90 L ed 760, 162 ALR 844). The nature of the tax before us, as spelled out in the second preceding paragraph, is not, as those in the drummer cases were held to be, a tax on interstate commerce nor on the privilege of conducting it, held unconstitutional in such cases as *Spector Motor Service, Inc.,* v. *O'Connor,* 340 US 602 (71 S Ct 508, 95 L ed 573). In *B. F. Goodrich Company* v. *State of Washington,* 38 Wash2d 663 (231 P2d 325) (certiorari denied, 342 US 876 [72 S Ct 167, 96 L ed 659]), where the activities of the taxpayer within the State were markedly similar to those of plaintiff in Michigan, the court said (p 673):

"It seems clear that, under this test, the sales made by the B. F. Goodrich Company in classes A, B, and D are constitutionally taxable. In all of these sales, business is channeled through the company's local outlets, and not only has appellant failed to demonstrate that the services rendered by these offices do not play a significant part in establishing and holding this market, it affirmatively appears that they do so. In this connection, *McLeod* v. *J. E. Dilworth Co.,* 322 US 327 (64 S Ct 1023, 88 L ed 1304), is of no assistance to appellant; for, there, the company which Arkansas sought to tax maintained no local office within Arkansas, but operated only through itinerant solicitors; and this fact, as the *Norton Company Case* (*Norton Co.* v. *Department of Revenue of Illinois,* 340 US 534 [71 S Ct 377, 95 L ed 517]) demonstrates, is sufficient to mark a controlling distinction between the *McLeod Case* and that at bar."

In *McGoldrick* v. *Berwind-White Coal Mining Co.,* 309 US 33, 56, 57 (60 S Ct 388, 84 L ed 565, 128 ALR 876), the court said:

"It is enough for present purposes that the rule of *Robbins* v. *Shelby County Taxing District, supra,*

has been narrowly limited to fixed-sum license taxes imposed on the business of soliciting orders for the purchase of goods to be shipped interstate."

Also, in the *Nippert Case* the court said (pp 424, 425):

"Thus the essence of the distinction taken in the *Berwind-White Case* was that the taxes outlawed in the drummer cases in their practical operation worked discriminatorily against interstate commerce to impose upon it a burden, either in fact or by the very threat of its incidence, which they did not place upon competing local business."

This distinction made in *Nippert* is highly significant here inasmuch as the facts before us, drawn from the sources above mentioned, show no such discrimination or undue burden.

Plaintiff cites *Fargo* v. *Michigan,* 121 US 230 (7 S Ct 857, 30 L ed 888), *New Jersey Bell Telephone Co.* v. *Tax Board of New Jersey,* 280 US 338 (50 S Ct 111, 74 L ed 463), *Freeman* v. *Hewit,* 329 US 249 (67 S Ct 274, 91 L ed 265), and other cases for the proposition that direct taxes on gross receipts from interstate commerce are forbidden to the States. None involved, as here, an apportioned adjusted receipts or income tax. In *Western Live Stock* v. *Bureau of Revenue of New Mexico,* 303 US 250, 256, 257 (58 S Ct 546, 82 L ed 823, 115 ALR 944), the court said:

"Taxation measured by gross receipts from interstate commerce has been sustained when fairly apportioned to the commerce carried on within the taxing state, *Wisconsin & M. R. Co.* v. *Powers,* 191 US 379 (24 S Ct 107, 48 L ed 229); *Maine* v. *Grand Trunk R. Co.,* 142 US 217 (12 S Ct 121, 163, 35 L ed 994); *Cudahy Packing Co.* v. *Minnesota,* 246 US 450 (38 S Ct 373, 62 L ed 827); *United States Express Co.* v. *Minnesota,* 223 US 335 (32 S Ct 211, 56 L ed 459), and in other cases has been rejected only because the apportionment was found to be inadequate or unfair.

*Fargo* v. *Michigan,* 121 US 230 (7 S Ct 857, 30 L ed 888); *Galveston, H. & S. A. R. Co.* v. *Texas,* 210 US 217 (28 S Ct 638, 52 L ed 1031); *Meyer* v. *Wells, Fargo & Co.,* 223 US 298 (32 S Ct 218, 56 L ed 445), with which compare *Wisconsin & M. R. Co.* v. *Powers, supra.* Whether the tax was sustained as a fair means of measuring a local privilege or franchise, as in *Maine* v. *Grand Trunk R. Co., supra; Ficklen* v. *Shelby County Taxing Dist.,* 145 US 1 (12 S Ct 810, 36 L ed 601); *American Manfg. Co.* v. *St. Louis,* 250 US 459 (39 S Ct 522, 63 L ed 1084), or as a method of arriving at the fair measure of a tax substituted for local property taxes, *Cudahy Packing Co.* v. *Minnesota, supra; United States Express Company* v. *Minnesota, supra; cf. Postal Telegraph Cable Co.* v. *Adams,* 155 US 688 (15 S Ct 268, 360, 39 L ed 311); see *McHenry* v. *Alford,* 168 US 651, 670, 671 (18 S Ct 242, 42 L ed 614), it is a practical way of laying upon the commerce its share of the local tax burden without subjecting it to multiple taxation not borne by local commerce and to which it would be subject if gross receipts, unapportioned, could be made the measure of a tax laid in every State where the commerce is carried on."

In *Central Greyhound Lines, Inc.,* v. *Mealey,* 334 US 653 (68 S Ct 1260, 92 L ed 1633), the court considered a State tax on gross receipts from the transportation of passengers between 2 points within the State over a route partially in and partially out of the State, and held such tax constitutional if apportioned to include mileage within the State and to exclude the mileage outside the State. The court said (p 663) of such tax that it was lawful if "fairly apportioned" to the "business done within the State by a fair method of apportionment." We hold that, within the meaning of this *Greyhound Case,* such fair method of apportionment is provided in the Michigan statute which levies a tax not on gross receipts (in view of its deductions, exemptions, and appor-

tionment features), but only on "adjusted receipts" derived from or attributable to Michigan sources, under an apportionment formula.

The so-called "Indiana Gross Receipts Tax" cases, referred to by plaintiff, such as *J. D. Adams Manfg. Co.* v. *Storen*, 304 US 307 (58 S Ct 913, 82 L ed 1365, 117 ALR 429), holding invalid such tax on gross receipts in Indiana from sales to out-of-state customers, are distinguishable in that that tax lacked an apportionment feature such as exists in the Michigan statute, and there the tax was sought to be levied by the seller's State on proceeds from sales outside the State, while involved here is a tax by the buyer's State. For cases upholding similar taxes imposed by the buyer's State, by reason of the activities in which the seller engaged in such State, see *West Publishing Co.* v. *McColgan,* 27 Cal2d 705 (166 P2d 861) (affirmed 328 US 823 [66 S Ct 1378, 90 L ed 1603]), and *Field Enterprises, Inc.,* v. *State of Washington,* 47 Wash2d 852 (289 P2d 1010) (affirmed 352 US 806 [77 S Ct 55, 1 L ed 2d 39]). These support this Michigan tax on plaintiff's business activities in this State, even if it were to be viewed as a gross receipts tax. In fact, however, it is not such tax, but an income tax, measured by adjusted receipts and arrived at by application of an apportionment formula and the prescribed rate.

Plaintiff, in alluding to cases approving State taxes on net income derived from interstate commerce apportioned to the taxing State, such as *United States Glue Co.* v. *Oak Creek* (1918), 247 US 321 (38 S Ct 499, 62 L ed 1135, Ann Cas 1918E, 748); *Shaffer* v. *Carter* (1920), 252 US 37 (40 S Ct 221, 64 L ed 445); *Underwood Typewriter Co.* v. *Chamberlain* (1920), 254 US 113 (41 S Ct 45, 65 L ed 165), says they are distinguishable in that the taxes upheld were measured by net income while the one at bar is measured by gross receipts, quoting, with respect

to the significance of that distinction, from the *United States Glue Co. Case.* Plaintiff terms this a gross receipts tax because, among the deductions permitted, permission is notably missing for deductions from gross receipts for payroll and depreciation. (Deduction for depreciation of real property is now permitted by the 1955 amendment.) In plaintiff's view, permission to make those deductions is prerequisite to the validity of the tax as an income tax. In this connection we quote from *Atlantic Coast Line R. Co.* v. *Daughton,* 262 US 413 (43 S Ct 620, 67 L ed 1051), footnote 6 on p 422, the following:

"The term 'net income,' in law or in economics, has not a rigid meaning. Every income tax act necessarily defines what is included in gross income; what deductions are to be made from the gross to ascertain net income; and what part, if any, of the net income, is exempt from taxation. These details are largely a matter of governmental policy. As to them States differ; and there is apt to be difference of view in the same States at different times; and at the same time a different definition of taxable net income for different classes of taxpayers. Obviously such differences in detail do not render obnoxious to the commerce clause a State income tax which is otherwise unobjectionable."

Accordingly, we think the mentioned income tax cases in point here and that their holdings and reasoning, by analogy at least, support the validity of the tax at bar.

Is the tax, as applied to plaintiff here, violative of due process for extraterritoriality? Does it tax transactions, events or activities beyond Michigan's borders? (See: *Compania General de Tabacos de Filipinas* v. *Collector of Internal Revenue* [1927], 275 US 87 [48 S Ct 100, 72 L ed 177]; *Equitable Life Assurance Society of the United States* v. *Pennsylvania* [1915], 238 US 143 [35 S Ct 829, 59 L ed 1239];

*Connecticut General Life Insurance Co.* v. *Johnson* [1937], 303 US 77 [58 S Ct 436, 82 L ed 673].) Does it attribute to taxable activity within Michigan's borders an unreasonable and arbitrary portion of plaintiff's activity elsewhere? (See: *Hans Rees' Sons, Inc.,* v. *North Carolina* [1931], 283 US 123 [51 S Ct 385, 75 L ed 879].) We think not. It does not attempt to reach outside the taxing State, as in *Connecticut General Life Insurance Co.* v. *Johnson, supra.* It does not reach profits attributable only to transactions beyond this State's borders as in *Hans Rees' Sons, Inc.,* v. *North Carolina, supra.* As held in that case, a reasonable apportionment formula, provided in the statute here under consideration, ends questions of due process. In keeping with the test in *James* v. *Dravo Contracting Co.,* 302 US 134 (58 S Ct 208, 82 L ed 155, 114 ALR 318), the tax is levied on activities carried on within this State. The statute carefully provides that it shall be levied only on "adjusted receipts," "derived from or attributable to Michigan sources." This makes for fair and reasonable apportionment of the tax to Michigan business, Michigan activities only. To requote from *Western Live Stock* v. *Bureau of Revenue of New Mexico,* 303 US 250, 256 (58 S Ct 546, 82 L ed 823, 115 ALR 944):

"Taxation measured by gross receipts from interstate commerce has been sustained when fairly apportioned to the commerce carried on within the taxing State."

When plaintiff seeks to attack the formula of apportionment as unreasonable or unfair, the distinct burden rests upon it of "showing by 'clear and cogent evidence' that it results in extraterritorial values being taxed." *Butler Brothers* v. *McColgan,* 315 US 501, 507 (62 S Ct 701, 86 L ed 991). Such are not the facts before us, to be drawn from the sources above

indicated. Plaintiff's receipts from business in this State for the period in question amounted to $91,-000,000. The tax exaction involved in this case is $95,951.71, or about 1/10 of 1% of the total Michigan business figure. This is not an unreasonable tax on business activities in Michigan. The tax as apportioned bears a real and reasonable relationship to the privileges, opportunities, and protection plaintiff enjoys in conducting its interstate business in this State. This meets the requirements of *International Shoe Co.* v. *State of Washington,* 326 US 310 (66 S Ct 154, 90 L ed 95, 161 ALR 1057), *Wisconsin* v. *J. C. Penney Co.,* 311 US 435 (61 S Ct 246, 85 L ed 267, 130 ALR 1229), *Ott* v. *Mississippi Valley Barge Line Co.,* 336 US 169 (69 S Ct 432, 93 L ed 585), and the many other cases on this subject.

We think it may be said of the due process clause as well as of the commerce clause, as was said concerning the latter by the United States supreme court in *Western Live Stock* v. *Bureau of Revenue of New Mexico,* 303 US 250, 254 (58 S Ct 546, 82 L ed 823, 115 ALR 944):

"It was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of State tax burden even though it increases the cost of doing the business. 'Even interstate business must pay its way,' *Postal Telegraph-Cable Co.* v. *City of Richmond,* 249 US 252, 259 (39 S Ct 265, 63 L ed 590); *Ficklen* v. *Shelby County Taxing Dist.,* 145 US 1, 24 (12 S Ct 810, 36 L ed 601); *Postal Telegraph Cable Co.* v. *Adams,* 155 US 688, 696 (15 S Ct 268, 360, 39 L ed 311); *Galveston, H. & S. A. R. Co.* v. *Texas,* 210 US 217, 225, 227 (28 S Ct 638, 52 L ed 1031)."

As already observed, this tax on Michigan business activities is arrived at by imposing a rate and applying an apportionment formula to "adjusted receipts" or "income" derived from or attributable to

Michigan sources. We have previously considered the applicability of the income tax case decisions, on the ground that the extent, character, and details of exemptions and deductions from gross proceeds are not decisive of the question of the nature of the tax. So considered, the case of *Northwestern States Portland Cement Co.* v. *Minnesota,* 358 US 450 (79 S Ct 357, 3 L ed 2d 421), is definitely controlling. . (See, also, its companion case, *Williams* v. *Stockham Valves & Fittings, Inc.,* 358 US 450, footnote [79 S Ct 357, 3 L ed 2d 421].) The *Cement Company Case* is conclusive of both the commerce clause and due process clause aspects of this case. There the court held that a State income tax imposed on a foreign corporation, computed at a nondiscriminatory rate on that portion of its net income from its interstate business which is reasonably attributable to its business activities in the taxing State, does not violate either the commerce clause or the due process clause of the Federal Constitution. The apportionment formula employed in that case is like that in the instant case. (Massachusetts formula.) The taxpayer's activities in the taxing State were no more extensive or elaborate, and, in fact, were very similar to those of plaintiff in Michigan. In every respect, it seems to us, both the holding and the reasoning of the court there are applicable to and controlling of the facts and situation at bar. In point from the opinion therein is the following (pp 458, 459, 461, 462) :

"It has long been established doctrine that the commerce clause gives exclusive power to the congress to regulate interstate commerce, and its failure to act on the subject in the area of taxation nevertheless requires that interstate commerce shall be free from any direct restrictions or impositions by the States. *Gibbons* v. *Ogden* (1824), 9 Wheat (22 US) 1 (6 L ed 23). In keeping therewith a State 'cannot

impose taxes upon persons passing through the State, or coming into it merely for a temporary purpose' such as itinerant drummers. *Robbins* v. *Shelby County Taxing District* (1887), 120 US 489, 493, 494 (7 S Ct 592, 30 L ed 694). Moreover, it is beyond dispute that a State may not lay a tax on the 'privilege' of engaging in interstate commerce, *Spector Motor Service* v. *O'Connor* (1951), 340 US 602 (71 S Ct 508, 95 L ed 573). Nor may a State impose a tax which discriminates against interstate commerce either by providing a direct commercial advantage to local business, *Memphis Steam Laundry* v. *Stone* (1952), 342 US 389 (72 S Ct 424, 96 L ed 436); *Nippert* v. *Richmond* (1946), 327 US 416 (66 S Ct 586, 90 L ed 760, 162 ALR 844), or by subjecting interstate commerce to the burden of 'multiple taxation,' *Michigan-Wisconsin Pipe Line Co.* v. *Calvert* (1954), 347 US 157 (74 S Ct 396, 98 L ed 583); *J. D. Adams Manfg. Co.* v. *Storen* (1938), 304 US 307 (58 S Ct 913, 82 L ed 1365, 117 ALR 429). Such impositions have been stricken because the States, under the commerce clause, are not allowed 'one single-tax-worth of direct interference with the free flow of commerce.' *Freeman* v. *Hewit* (1946), 329 US 249, 256 (67 S Ct 274, 91 L ed 265).

"On the other hand, it has been established since 1918 that a net income tax on revenues derived from interstate commerce does not offend constitutional limitations upon State interference with such commerce. * * *

"We believe that the rationale of these cases, involving income levies by States, controls the issues here. The taxes are not regulations in any sense of that term. Admittedly they do not discriminate against nor subject either corporation to an undue burden. While it is true that a State may not erect a wall around its borders preventing commerce an entry, it is axiomatic that the founders did not intend to immunize such commerce from carrying its fair share of the costs of the State government in return for the benefits it derives from within the State.

The levies are not privilege taxes based on the right to carry on business in the taxing State. The States are left to collect only through ordinary means. The tax, therefore, is 'not open to the objection that it compels the company to pay for the privilege of engaging in interstate commerce.' *Underwood Typewriter Co.* v. *Chamberlain* (1920), 254 US 113, 119 (41 S Ct 45, 65 L ed 165). As was said in *Wisconsin* v. *Minnesota Mining & Manfg. Co.* (1940), 311 US 452, 453 (61 S Ct 253, 85 L ed 274), 'it is too late in the day to find offense to that [commerce] clause because a State tax is imposed on corporate net income of an interstate enterprise which is attributable to earnings within the taxing State.'

"While the economic wisdom of State net income taxes is one of State policy not for our decision, one of the 'realities' raised by the parties is the possibility of a multiple burden resulting from the exactions in question. The answer is that none is shown to exist here. This is not an unapportioned tax which by its very nature makes interstate commerce bear more than its fair share. As was said in *Central Greyhound Lines* v. *Mealey* (1948), 334 US 653, 661, 670 (68 S Ct 1260, 92 L ed 1633), 'it is interstate commerce which the State is seeking to reach and  \*  \*  \* the real question [is] whether what the State is exacting is a constitutionally fair demand by the State for that aspect of the interstate commerce to which the State bears a special relation.' The apportioned tax is designed to meet this very requirement and 'to prevent the levying of such taxes as will discriminate against or prohibit the interstate activities or will place the interstate commerce at a disadvantage relative to local commerce.' "

Application of the above quoted language from *Northwestern Cement Company* to the facts here, leaves the validity of the Michigan tax undoubted. For here, as in that case, (1) there is no direct restriction on interstate commerce, (2) the tax is not imposed on persons coming into the State for a tem-

porary purpose, such as itinerant drummers, (3) the tax is not laid on the privilege or right of engaging in interstate commerce in the State, (4) the tax does not discriminate against interstate commerce by providing a direct commercial advantage to local business, nor does it subject it to an undue burden, but, on the contrary, it is laid alike on activities in furtherance of either inter- or intrastate business, computed according to the adjusted receipts therefrom derived from or attributable to Michigan sources, (5) the tax is not a regulation of any kind, (6) the State is left to collect only through ordinary means and, hence, the tax does not compel plaintiff to pay for the privilege of engaging in interstate commerce, (7) as in *Northwestern Cement Company,* the possibility of a multiple burden from this exaction is not made to appear here, (8) this is not an unapportioned tax which by its very nature makes interstate commerce bear more than its fair share and, (9) what the State is exacting is a constitutionally fair demand for that aspect of interstate commerce to which this State bears a special relation. Accordingly, the tax must be held to be constitutional and valid as applied to plaintiff and its activities here. In the language of the trial judge:

"It is our view that in necessary result the business activities tax here reaches income-producing transactions in the State of Michigan; that there is a sufficient activity here in the State to establish jurisdictional presence for tax purposes, and that the formula used since it attempts to reach only that portion which is attributable to Michigan activity, contravenes neither the due process nor commerce clauses of the Federal Constitution."

We reject plaintiff's claim that the taxing act violates Michigan Constitution (1908), art 10, § 6, for failure to distinctly state the tax and because of its reference to the United States Constitution in ex-

empting that which the State may not tax under that Constitution. This recognition in the statute of the State's limitations with respect to imposing a tax violative of the United States Constitution is not an infirmity such as is contemplated by article 10, § 6. Neither is the section violated by the provision in the statute (section 19, CLS 1956, § 205.569 [Stat Ann 1959 Cum Supp § 7.557(19)]) that the department of revenue, in promulgating rules governing deductions as it is therein directed to do, shall follow, where not inconsistent with the act, the rulings of the Federal internal revenue bureau with respect to income tax. It is still the rules of the State department, promulgated as provided by and consistent with the statute, which govern, within the limitations fixed by the statute, and that comports with traditional practice in this State. We find that, despite some lack of artistry in phrasing of section 2(b) of the original act and of section 3(b) of the act as amended, careful attention to their provisions, together with all of those of section 3 as amended (CLS 1956, § 205.553 [Stat Ann 1959 Cum Supp § 7.557 (3)]), should make the computation of the tax well within the competence of those employed in the defendant department and of taxpayers generally affected thereby.

Finally, the parties are in disagreement as to the proper construction to be given the term "gross receipts," as used in the act, as relates to a taxpayer whose business transactions occur partially within and partially without this State. Plaintiff contends that in determining the adjusted receipts of such taxpayer derived from or attributable to Michigan sources, by application of the apportionment formula to adjusted receipts, the latter are to be arrived at by subtracting the statutory deductions from gross receipts from plaintiff's Michigan sales only. This, plaintiff reasons, follows from the act's definition of

gross receipts as the taxpayer's entire receipts, with certain exceptions, from business as therein defined and its definition of business as activities engaged in within this State. Defendants say such deductions are to be taken from plaintiff's gross receipts from sales both in and outside Michigan with the resulting adjusted receipts forming the basis, by formula application, for determining adjusted receipts attributable to Michigan. If plaintiff's contention were given effect, the taxpayer with a total of $1,000,000 receipts whose business transactions all occurred inside Michigan would pay a higher tax than the taxpayer who received $1,000,000 from Michigan sales and $1,000,000 from out-of-State sales, and the latter would pay a great deal more than a third taxpayer who received $1,000,000 from Michigan sales and $10,000,000 from sales outside Michigan. There is nothing in the act to suggest such legislative intent. Clearly the legislature intended that each should pay a comparable tax on its comparable Michigan activities producing $1,000,000 of receipts from Michigan sales. The provisions of the act providing for taxing of activities of one whose business transactions occur entirely in Michigan and those providing for taxing the activities in Michigan of a taxpayer whose business transactions occur partially within and partially without this State, complement each other, as was held in *Western Electric Co.* v. *Revenue Department,* 312 Mich 582, with respect to the Michigan sales tax and its use tax. Complementary taxing of local and interstate business was upheld in *Nelson* v. *Sears, Roebuck & Co.,* 312 US 359 (61 S Ct 586, 85 L ed 888, 132 ALR 475). While the tax may not discriminate against interstate commerce, there is no constitutional requirement that it do so against intrastate sales, and the statute evidences no legislative intent to do so. To accept plaintiff's theory poses the question why the statute requires inclusion

of gross receipts from sales within and without the State as the denominator in the sales quotient part of the apportionment formula. It is unreasonable to assume that only Michigan gross receipts are to be used as the base for arriving at adjusted receipts derived from Michigan sources, when the formula to be used for that purpose includes as one of its factors a fraction whose denominator is gross receipts derived from everywhere. It is manifest that this process would utterly fail to reflect fairly the proportion of plaintiff's adjusted receipts attributable to and derived from Michigan sources. This would defeat, in part, the object of the act to tax business activities in Michigan equally by levying on all the income derived therefrom which is attributable to Michigan sources.

Affirmed, without costs, a public question being involved.

CARR, KELLY, SMITH, BLACK, and EDWARDS, JJ., concurred.

KAVANAGH, J., did not sit.

SOURIS, J., took no part in the decision of this case.