UNITED STATES GYPSUM COMPANY *v.* DEPARTMENT
OF REVENUE.

1. Constitutional Law—Reading of Bills.

The reading of a bill, twice by title and once in full, constitutes
a substantial compliance with provision of the Constitution
requiring that every bill shall be read 3 times in each house
before final passage thereof (Const 1908, art 5, § 23).

2. Same—Amendment of Bill—Germaneness.

Changes in legislation are germane, where made by the legis-
lature in the course of passage of a bill, whether by amend-
ment or substitution of an entire bill, provided the changes
fall within the general purpose of the original bill or are ex-
tensions of it, and such changes may be made at any time dur-
ing the 5-day period in which the bill must be in the possession
of each house (Const 1908, art 5, §§ 22, 23).

3. Same—Taxation—Major Purposes of Bill—Substitution.

Legislation known as the business activities tax act *held*, valid,
where both original and substitute versions had the major pur-
poses of raising revenue from a tax on income and provided
machinery for collecting and enforcing the same, notwith-
standing there were substantial differences in content and im-
pact between the 2 versions (Const 1908, art 5, §§ 22, 23; CLS
1956, § 205.551 *et seq.*, as amended).

4. Statutes—Presumption as to Constitutionality.

There is a strong presumption that constitutional requirements
have been met in enacted legislation.

5. Taxation—Statutes.

Belated attacks on tax statutes are not favored.

---

References for Points in Headnotes

[1, 6]  50 Am Jur, Statutes §§ 79–82.
[2, 3]  50 Am Jur, Statutes § 75.
Construction and application of constitutional provision against
changing purpose of bill during passage.  158 ALR 421.
[4]  11 Am Jur, Constitutional Law § 128 *et seq.*
[7]  14 Am Jur, Costs § 37.

6. Statutes—Constitutional Law.
    Substitute for house bill, presented in senate and adopted the next day, returned to house and adopted the following day *held*, to have complied with the constitutional requirements as to passage, where each house had had possession of the bill 5 days and the substitute version was germane to bill as originally introduced (Const 1908, art 5, §§ 22, 23).

7. Costs—Public Question—Constitutionality of Tax Statute.
    No costs are allowed in action belatedly testing validity of tax legislation, a public question being involved (Const 1908, art 5, §§ 22, 23; CLS 1956, § 205.551 *et seq.*, as amended).

    Black and Kavanagh, JJ., dissenting.

Appeal from Wayne; O'Hara (Chester P.), J. Submitted April 4, 1961. (Docket No. 1, Calendar No. 48,538.) Decided September 21, 1961. Rehearing denied November 30, 1961.

Assumpsit by United States Gypsum Company, an Illinois corporation, against State of Michigan, Department of Revenue, and Louis M. Nims, commissioner of revenue, to recover sums paid on business activities tax. Judgment for defendant on pleadings. Plaintiff appeals. Affirmed.

*Butzel, Eaman, Long, Gust & Kennedy (MacLeish, Spray, Price & Underwood,* of counsel), for plaintiff.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, *T. Carl Holbrook, Maurice Barbour,* and *William D. Dexter,* Assistant Attorneys General, for defendants.

Edwards, J. Appellant appeals from the dismissal on motion of its suit in assumpsit for recovery of certain taxes paid by it in relation to a period extending from the third quarter of 1953 through the second quarter of 1955.

This is still another attack upon the constitutionality of the business activities tax (PA 1953, No

150)[1] which we have recently affirmed. (See *Armco Steel Corp.* v. *Department of Revenue,* 359 Mich 430, and *Eaton Manfg. Co.* v. *Department of Revenue,* 359 Mich 459.) In this instance, however, plaintiff relies upon procedural omissions in legislative adoption of the final version of the tax bill which it asserts violated sections 22 and 23 of article 5 of the Michigan Constitution of 1908.

The applicable portion of section 22 provides:

"No bill shall be passed or become a law at any regular session of the legislature until it has been printed and in the possession of each house for at least 5 days."

The applicable portion of section 23 provides:

"Every bill shall be read 3 times in each house before the final passage thereof."

It is conceded that the original version of House Bill No 353, which became PA 1953, No 150, was before both houses for more than 5 days and was read at least twice by title and once in full before each house. This has been held repeatedly by this Court to be substantial compliance with sections 22 and 23, and no question is presented by this appeal in this respect. *People, ex rel. Hart,* v. *McElroy,* 72 Mich 446 (2 LRA 609); *McClellan* v. *Judge of Recorder's Court of Detroit,* 229 Mich 203.

House Bill No 353 (exhibit D) was originally introduced by Representative Christman.[2] Subsequent to its introduction, 2 substitute versions were presented (exhibits A and B). The second of these exhibits, introduced by Senator Higgins, was the final version of House Bill No 353 which ultimately became the business activities tax, PA 1953, No 150.

---

[1] See, currently, CLS 1956, § 205.551 *et seq.,* as amended (Stat Ann 1960 Rev § 7.557[1] *et seq.*).

[2] 1 House Journal 1953, p 449.

Exhibit B was first introduced in the senate on May 12th, printed in the senate journal on May 18th, and passed the senate on May 19, 1953.[3]  The exhibit B (Higgins) version of House Bill No 353 went to the house on the same day where it was adopted the following day, May 20, 1953.[4]

There is no record that the substitute version was ever read in the house and, of course, it was not before that house for 5 days.

Appellees' answer is that the substitute served the same purpose as that proposed by the original bill, was germane to it, and hence should not be regarded as a new bill.

This was essentially the issue presented to the Wayne county circuit court by appellant's motion for summary judgment.  The circuit judge had before him a factual record of the legislative proceedings presented under local court rule 14, subd (b), of the 3d judicial circuit:

"When public records are to be used as evidence, the party intending to use them may prepare a copy, synopsis or abstract of them, insofar as they are to be used, and may present such copy, synopsis or abstract to the adverse party at the hearing on the pretrial admission and discovery conference docket, and such copy, synopsis or abstract shall thereupon be admissible in evidence as admitted facts in the case, if otherwise admissible, except insofar as its inaccuracy shall be pointed out, under oath, by the adverse party, in an affidavit filed and served before the case is passed from the pretrial admission and discovery conference docket."[5]

From the factual record thus presented, appellant makes the following comparison of the original bill and the substitute which was ultimately adopted:

---

[3] 2 Senate Journal 1953, pp 1130, 1274–1292, 1304–1307.
[4] 2 House Journal 1953, pp 1612–1615.
[5] Honigman, Michigan Court Rules Annotated, 1959 Supp, p 291.

"The caption of the Christman bill, in part, described it as prescribing certain specific taxes 'on income.' The Christman bill consisted of 14 sections and would have provided for a general unclassified tax of 1% on personal income and business income of every person who paid a Federal income tax. The tax base would have been the same as 'taxable net income' for Federal income tax purposes. Among its other salient features, the Christman bill would have expressly provided for:

"(a) a supplementary $600 ($1,200 if married) exemption for individual taxpayers only;

"(b) a 3-factor apportionment formula (applicable to corporations only) based on property, payrolls, and sales, for allocating multi-State income to Michigan;

"(c) authority for the State commissioner of revenue to permit deviations from the 3-factor apportionment formula in 'special cases';

"(d) authority for the State commissioner of revenue to adjust for collusive misallocations, less than arm's length transactions, and transactions between affiliated corporations;

"(e) combined returns;

"(f) procedures for compelling testimony and the production of books and records before the State commissioner of revenue;

"(g) immunity from prosecution for witnesses;

"(h) publication of the department of revenue's rulings and orders; and

"(i) maximum criminal penalties of $1,000 fine and/or 1 year's imprisonment for violation of the act. * * *

"The Higgins substitute consisted of 23 sections and provided for a classified tax on the 'adjusted receipts' of businesses only at the rate of 4 mills, with a special rate of 1 mill for public utilities. The tax base was to be adjusted receipts determined by allowing certain deductions from business gross receipts, but not permitting any deductions for depreciation or for wages and salaries paid. Among

its other salient features the Higgins substitute expressly provided for:

"(a) exemption of the first $10,000 of adjusted receipts;

"(b) a standard 50% minimum deduction from gross receipts;

"(c) a single factor apportionment formula based on receipts only, with special provisions for service businesses, transportation businesses, and financial businesses;

"(d) civil remedies to enforce collection, including injunctive relief."

These are, of course, substantial differences both in content and impact as between the 2 versions. But the question for our decision really is whether or not the new version was so completely different as to constitute a new *bill* within the meaning of the word as it is used in Const (1908), art 5, §§ 22 and 23.

The circuit judge (we think correctly) viewed the legal situation thus:

"The legislature has the right to amend any bill by enlarging or diminishing, being bound only to the territory included in the bill. *Attorney General* v. *Rice,* 64 Mich 385; *Pack* v. *Barton,* 47 Mich 520; *Attorney General* v. *Amos,* 60 Mich 372, 380. In this latter case it was held that it was immaterial whether the method pursued by the legislature was by amendment or by substitute for the original bill so long as the substitute was for the same purpose as the original bill and not for another and different purpose; in other words, is the substitute bill in harmony with the objects and purposes of the original bill and germane thereto? See, also, *People, ex rel. Hart,* v. *McElroy,* 72 Mich 446 (2 LRA 609); *Moeller* v. *Wayne County Board of Supervisors,* 279 Mich 505, 517; *Allied Mutual Ins. Co.* v. *Bell,* 353 Mo 891 (185 SW2d 4, 158 ALR 415); and annotation 158 ALR 421."

The circuit judge held exhibit B to be germane.

Appellant contends that the substitute was substantially different from the original, and that the procedure employed by the legislature defeated the public-knowledge purpose of article 5, §§ 22 and 23 (Const 1908). The public-knowledge purpose is not spelled out in the constitutional requirement—and may have been fulfilled (for all this record shows) beyond the greatest expectations of 1908. Differences there certainly were, as we have indicated, but the question remains as to whether or not there was sufficient similarity of purpose as to be described as germane.

The question of when an amendment or substitute is germane to the original bill is a difficult one. See 158 ALR 421, annotation. The test is whether or not the change (by either method) represented an amendment or extension of the basic purpose of the original, or the introduction of entirely new and different subject matter. 1 Sutherland, Statutory Construction (3d ed), § 805.

If the actual situation revealed the latter purpose, this Court has not hesitated to hold void legislation enacted to evade the procedural requirements which the Constitution places on legislation. *Sackrider* v. *Board of Supervisors of Saginaw County,* 79 Mich 59; *Attorney General* v. *Detroit & Saline Plank Road Co.,* 97 Mich 589.

Where, however, the changes fall within the general purpose of the original bill, or are extensions of it, the Court has termed them germane.

In an early case involving the then-constitutional prohibition against introduction of any new bill after the first 50 days of the legislative session, Mr. Justice Cooley wrote the opinion of the Court:

"The facts in the case are that within the 50 days a bill was introduced for the organization of the

township of Montmorency, and that after the 50 days had expired this bill was so changed as to make it a bill for the organization of the county of Montmorency. The territory embraced in each bill was the same. The relator contends that the second was to all intents and purposes a new bill; the defendants insist that it was only the first bill amended.

"It may be said of the 2 that they had in view the same general purpose, to give to the inhabitants of the territory described a distinct municipal government. The first contemplated a government of one grade; the second, one of another; but there was no departure in the second from the general intent of the first. Neither does any necessary inference arise that in the change made there was a purpose to evade the constitutional command. The question being one of organizing the inhabitants of a particular territory for the purposes of local government, the legislature, on consideration of the scheme proposed, concluded to modify it to the extent of conferring county powers where only township powers had been proposed.

"To attempt on this record to indicate the limits of constitutional power in the amendment of bills previously introduced would be uncalled for and therefore unwarranted. It suffices to say that in this case, where the general purpose has been kept in view, and a design to circumvent or disregard the Constitution is not apparent, it cannot be held that the constitutional authority has been exceeded. No one disputes that whatever is within the proper scope of amendment is as much admissible after the 50 days as before, and this must embrace whatever is germane to the purpose which the bill had in view. And if in any case we doubt whether the Constitution has been disregarded, we must defer to the legislative judgment. *Sears* v. *Cottrell*, 5 Mich 251; *People* v. *Mahaney*, 13 Mich 48." *Pack* v. *Barton*, 47 Mich 520.

In a more recent case dealing with 1 of the identical constitutional requirements relied on herein, the Court, after a review of case precedent, held:

"It would appear from the foregoing cases that that part of Const 1908, art 5, § 23, is not violated if the amendments are germane to the purpose of the original bill, even though not read 3 times, provided the original bill complies with section of the Constitution above quoted." *Moeller* v. *Wayne County Board of Supervisors,* 279 Mich 505, 517.

Turning directly to the issue of germaneness, we find that the Higgins substitute for the original version, House Bill No 353, was, like the original, (1) a bill to raise revenue; (2) a tax on income; (3) a bill to set up machinery for collecting and enforcing same. These major purposes were all within the original objectives of the bill as first introduced and as described in the title of the original version of the bill.[6]

Further, though certainly not controlling of decision, we have in this instance the recorded legislative view through the adoption of the substitute that it was germane and within the purposes of the original bill.

There is, of course, a strong presumption that constitutional requirements have been met in enacted legislation. 1 Sutherland, Statutory Construction (3d ed), § 905. And attacks upon tax statutes (particularly as here—belated ones) are not favored. *Thoman* v. *City of Lansing,* 315 Mich 566.

---

[6] House Bill No 353, entitled: "A bill to provide for the raising of additional public revenue by prescribing certain specific taxes on income; to provide for the ascertainment, assessment and collection thereof; to prescribe certain exemptions; to prescribe the powers and duties of the State department of revenue with respect thereto; to provide for the disposition of revenues received therefrom; and to prescribe penalties for violations of the provisions of this act." 1 House Journal 1953, p 449.

On the factual situation shown by this record, we hold that the Higgins substitute, exhibit B, was germane to House Bill No 353 *as originally introduced,* and hence that no constitutional violation was established.

Affirmed. No costs, a public question being involved.

Dethmers, C. J., and Carr, Kelly, Smith, and Souris, JJ., concurred with Edwards, J.

Black, J. *(dissenting).* I cannot sign the majority opinion. It is but the latest of " 'an attritional series of judicial decisions' rendering innocuous, and without the intervention of the electorate, a constitutional prohibition." (See Mr. Justice Smith in *Lockwood* v. *Commissioner of Revenue,* 357 Mich 517, 556.) Surely there is no more direct way to ultimate destruction of constitutional government than a series of judicial decrees saying to the legislative branch "You may," when the people through their Constitution have said "You may not." This constitutionally required statement of reasons for dissent is, then, written as an appeal "to the intelligence of a future day"[1] when some later decision may resurrect that part of the Constitution today's majority has effectively disemboweled.

My vote to reverse is cast on strength of the people's mandate, appearing in section 22 of article 5,[2] that "No bill shall be altered or amended on its

[1] This is from the pen of Chief Justice Charles Evans Hughes. The complete quotation is as follows:

"A dissent in a court of last resort is an appeal to the brooding spirit of the law, to the intelligence of a future day, when a later decision may possibly correct the error into which the dissenting judge believes the court to have been betrayed." See employment of this quotation in *Valentini* v. *City of Adrian,* 347 Mich 530, 547, 548.

[2] "Sec. 22. No bill shall be passed or become a law at any regular session of the legislature until it has been printed and in the possession of each house for at least 5 days. No bill shall be passed at a special session of the legislature on any other subjects than those

passage through either house *so as to change its original purpose."* As primary guardians of the Constitution it is our sworn duty to admonish the legislature that it must obey such bidding of the people on penalty of nullification of what that body does in disparagement thereof.

Section 22 was new when the revised Constitution became "the supreme law of the State" January 1, 1909 (Schedule, § 11). It was proposed for an "original purpose" made doubly clear before the electorate by the convention's "Address to the People of the State of Michigan," which address is relevantly valuable if not conclusive evidence of "the public history of the times."[3] The convention's address, appearing under said section 22, reads from start to finish as follows:

"This is a new section. It was inserted to prevent hasty and careless legislative action, also, to deal effectively with so-called snap legislation. The provision that no bill shall be passed until it has been printed and in the possession of each house for 5 days means much greater publicity in legislative proceedings. Time is thus provided whereby the people may become acquainted with proposed legislation and to petition, or remonstrate, before a bill is passed. It is believed that this provision will measurably improve the tone of legislative action. When the legislature is convened in special session the revision limits its action to those matters expressly stated in the governor's proclamation. This wisely limits the sphere of action of the legislature, in special session; and the governor's proclamation is notice to the public of the work which the legislature can lawfully undertake. The provision that no

expressly stated in the governor's proclamation or submitted by special message. No bill shall be altered or amended on its passage through either house so as to change its original purpose." (Art 5, § 22, Const 1908.)

[3] See quotations, *infra,* from *People, ex rel. Bay City,* v. *State Treasurer,* 23 Mich 499, and *People* v. *Harding,* 53 Mich 481.

bill shall be *altered* on its passage so as to change its original purpose is included so that by no possibility can the publicity secured by the 5-day rule be nullified or evaded." 2 Debates, Constitutional Convention 1907–1908, p 1422.

(In its prefatory note the convention referred to the legislative request of 1907 [PA 1907, No 272, § 10], calling on the convention to "prepare and adopt an address to the people of the State, explaining the proposed changes in the present Constitution, the reason for each change, and such other matters as to the convention shall seem advisable.")

I would implement such declaration of constitutional purpose by construing section 22 as the people —by the quoted address—were led to construe it in the adoption thereof. The people wanted to prevent hasty and careless legislative action; they wanted to eliminate "so-called snap legislation," and they wanted the legislature so controlled "that by no possibility can the publicity secured by the 5-day rule be nullified or evaded." All this is unmistakable. Also unmistakable is the fact that the combined aim of the first and final sentences of said section 22 was brazenly scorned when the presently considered substitute bill was conceived in the senate, sent to the house and snap-adopted there.

When House Bill No 353 was passed in that chamber and sent to the senate, the latter body referred it to committee April 30, 1953. A substitute bill (ultimately enacted into said act 150) was made up in the senate and passed by that body on May 19, 1953. The house passed the substitute bill the next day, May 20, 1953. Fast work, indeed, for contemplative consideration of a most complex experiment —a national novelty in fact—in the field of specific taxation.[4]

---

[4] "Finally, more or less in desperation as the session was drawing to a close, the house of representatives passed and sent to the senate

That legally elastic and visibly slippery word "germane" should *not* be employed as this Court proceeds to interpretively apply the concluding sentence of said section 22. The legislature neither requires nor should have, that sentence considered, any more tether as the process of amendatory adjustment of an introduced and printed bill is hurried toward enactment. So let us ascertain, not what was or is "germane" to the purpose of originally introduced House Bill No 353 (we have before us no question of sufficiency of title under preceding section 21); rather let us seek out the "original purpose" of that bill to determine whether such purpose was changed in violation of section 22. This, I apprehend, is the better approach to the presented question, a question that turns not upon the uncertainty of semantics but upon due comparison of recorded facts; in this instance the bill as it stood upon introduction and the twice-changed bill as it stood upon enrollment as a public act.

Counsel for plaintiff are right when they say that the original purpose of House Bill No 353 was that of enacting a State income tax "which would dovetail with the scheme of the Federal income tax." The original purpose of House Bill No 353 was stated precisely March 19, 1953. Here is original section 2 of the bill:

---

2 income tax bills—one, the Christman bill [House Bill No 353], providing for a personal income tax of 1% on all individuals and corporations. The circumstances were such that the senate taxation committee, to which the house-passed bills were referred, was faced with the dilemma of reporting out an income tax bill in the form passed by the house or in an amended form which would be germane to one of the house bills.

"The senate taxation committee was also faced with the problem of re-examining all possible methods of taxing the gross income or gross receipts of business, if an individual income tax were to be avoided—a result, incidentally, which was very much desired by legislators facing an election next year. The result was the business receipts tax which was passed as an amendment to the Christman bill imposing an income tax of 1% across the board." (Gornick, page 8, publication cited *infra*.)

"Sec. 2.  There is hereby levied annually upon and there shall be collected from each person filing an income tax return with the Federal government a sum equal to 1% of the taxable net income with respect to which a Federal income tax is applicable. Such tax shall be imposed and collected at the same time and covering the same period as Federal returns are required of individuals.

"The State department of revenue is hereby vested with the power and it shall be its duty to administer the provisions of this act.  The department is hereby authorized to promulgate such rules and regulations and to incur such expense and employ such assistants as shall be necessary in carrying out the provisions of this act."   (Exhibit D, appendix.)

Later, by amendment and prior to *first* passage in the house, the purpose of the bill became one of levy of a "business profits and personal income tax act."[5]

The change, from original section 2 quoted above, was effected by house-wrought new section 5 of the bill, reading as follows:

"Sec. 5.  For the privilege of receiving, earning or otherwise acquiring income from any sources whatsoever and, in the case of a corporation, for the additional privilege of exercising its franchise in this State in a corporate or organized capacity on or after the effective date of this act, *there is hereby levied and imposed upon the net taxable income of every person a specific tax equal to 2% of the net taxable income* as defined in this act to the extent such income is realized in any tax year."   (Exhibit A, appendix.)

Finally, House Bill No 353 included, when it left the house for the senate, a specific declaration of purpose reading as follows:

"Sec. 22.  *It is hereby declared that the purpose of this act, in addition to the essential purpose of rais-*

---

[5] "Sec. 1.  This act shall be known and may be cited as the 'business profits and personal income tax act.'"   (Exhibit A, appendix.)

*ing revenue, is to conform as closely as may be with
the internal revenue code,* in order that the filing of
returns or reports may be simplified and the tax-
payer's accounting burdens may be reduced.  To
carry out such purpose, the commissioner is au-
thorized to issue rules and regulations in conformity,
as far as possible, with the income tax regulations
adopted by the commissioner of internal revenue for
Federal income tax purposes." (Exhibit A, appen-
dix.)

Citing various authoritative publications, the
unitary points of which are that the ultimately
enacted bill "is something of a hybrid, possessing
characteristics of a net income tax and a gross re-
ceipts tax, but differing fundamentally from them, as
the tax base is 'adjusted receipts' "  ;[6] that "this new
tax is generally referred to as the Michigan business
receipts tax.  The tax is unique in that it is the first
tax enacted anywhere in the United States on any
level, Federal, State, or local, which uses the con-
cept of 'value added' as the tax base" ;[7] that "the
Michigan business receipts tax, so far as I am aware,
is the first application of the principle in this country
and, for this reason, is exciting the interest of
students of taxation and finance throughout the
United States" ;[8] that "the business receipts tax has
no precedent and no exact counterpart in the statutes
of the United States, the several States, or any
political subdivision thereof" ;[9] that "the tax is

[6] Donovan J. Rau, director of the specific tax on business income,
Michigan department of revenue, writing in the June, 1954, publication
of the American Woman's Society of Certified Public Accountants,
page 4.
[7] Arnold J. Zurcher, Jr., preface to "History of Value-Added Taxa-
tion".
[8] The Michigan Business Receipts Tax, address by Alan L. Gornick,
tax counsel Ford Motor Co., delivered University of Michigan Law
Institute July 30, 1953, page 12.
[9] Peter A. Firmin, The Michigan Business Receipts Tax, pp 7, 8
(publication of the bureau of business research, School of Business
Administration, University of Michigan).

neither a gross receipts tax nor a net income tax" ;[10] and that "the basis of the tax, then, is income (adjusted receipts) as defined in the statute. The tax, however, is not a *net* income tax because *all* expenses are not deductible. Thus, a tax may be assessed even if the taxpayer experiences a loss."[11], counsel convincingly prove that PA 1953, No 150, departed radically from the original purpose of House Bill No 353 as that bill stood upon introduction, and again as the bill stood when it rode from the house to the senate April 29, 1953, and that it was no longer purposed as a fearsome State income tax.[12]

Fair comparison of House Bill No 353, as originally purposed and amended in the house, with Act No 150 as it appears in the Public Acts of 1953, leads to but one conclusion. The "original purpose" was a politically hot State personal income tax, geared to and powered by like Federal income taxation; whereas the final section-linkage turned out by the legislative sausage machine was a tax on "business activities," defined last year this way (*Armco Steel Corp.* v. *Department of Revenue*, 359 Mich 430, 444):

"This tax is part of a general scheme of State taxation of business activities in Michigan. It is a

---

[10] Firmin, same publication, p 10.

[11] Firmin, same publication, p 28.

[12] The annual 1953 Law Institute, held in the Rackham building, Ann Arbor, was devoted principally to consideration of various papers analyzing Michigan's "new business receipts tax." Professor Pierce, of the faculty of the University of Michigan Law School, having accepted the topic "Computation of the Tax Base: Intrastate Transactions," opened his part of the discussion with these notes (p 7, "Syllabus of the Presentations at the Institute on the New Business Receipts Tax"):

"A. The business receipts tax is an additional tax on the privilege of engaging in business in Michigan.

"B. The tax is measured by adjusted receipts which may be compared roughly to net income plus payroll.

"C. The rate of the tax is 4 mills for all businesses other than public utilities for which the rate is 1 mill."

tax on Michigan activities measured, in amount, by adjusted receipts derived from or attributable to Michigan sources, which, as above noted, in the case of a taxpayer whose business transactions occur entirely within Michigan, means his entire adjusted receipts, but, if his business transactions occur partly within and partly without this State, means the sum reached by applying to his adjusted receipts the mentioned apportionment formula. It is, therefore, not a gross receipts tax."

The lay taxpayer would quickly recognize this change of purpose, whether he be germane-minded or not. And his view should be paramount since the question put to us is not one of statutory interpretation but of constitutional right of a people. See Mr. Justice CAMPBELL, writing for the Court in *People* v. *Dean,* 14 Mich 406, 417, 418:

"The cardinal rule of construction, concerning language, is to apply to it that meaning which it would naturally convey to the popular mind, in all cases where the propriety of such construction is not negatived by some settled rule of law. In all instruments which are submitted for confirmation to the people themselves, and which derive all their validity from a popular vote, such a construction is peculiarly necessary; for otherwise they would be defrauded of the right to frame their own government according to their own will."

Turning directly to the majority opinion:

It is a mistake to read *Pack* v. *Barton,* 47 Mich 520, as authorizing present application of the test of germaneness. *Pack* was written of criticized legislative practice when the Constitution contained no ban whatever against change of original purpose on "passage through either house." It with related cases handed down during the 19th century may well have furnished the direct impetus for inclusion, in the Constitution, of presently scrutinized section 22.

As for *Moeller* v. *Wayne County Board of Supervisors,* 279 Mich 505, it is suggested with due deference that the Court erroneously applied old and new authorities construing what is now section 21 (of article 5), which section by repeated decision has been germane-varnished no end. There can be little doubt about this when such supporting authorities are reviewed. They are *Westgate* v. *Township of Adrian,* 161 Mich 333; *Lundstrom* v. *Township of Ellsworth,* 196 Mich 502; *Detroit International Bridge Co.* v. *American Seed Co.,* 249 Mich 289; and *People* v. *Martin,* 235 Mich 206.

Following *Moeller,* in this Gypsum Case, we tell a sadly cynical profession and an expectably delighted legislature that the latter may with impunity circumvent a wholesome restriction the people trustfully placed in their Constitution a half century ago. Mr. Justice Cooley warned against such "evasions and circumventions" in words some of us have recently heeded (*Bacon* v. *Kent-Ottawa Metropolitan Water Authority,* 354 Mich 159, 174–176; *Lockwood* v. *Commissioner of Revenue,* 357 Mich 517, 555, 567, 568). I refer to that precept of constitutional construction, appearing in *People, ex rel. Bay City,* v. *State Treasurer,* 23 Mich 499, 506, which during the intervening 90 years has come to universal acceptance in exalted legal circles throughout the United States:

"Constitutions do not change with the varying tides of public opinion and desire; the will of the people therein recorded is the same inflexible law until changed by their own deliberative action; and it cannot be permissible to the courts that in order to aid evasions and circumventions, they shall subject these instruments, which in the main only undertake to lay down broad general principles, to a literal and technical construction, as if they were great public enemies standing in the way of progress, and the duty of every good citizen was to get around

their provisions whenever practicable, and give them a damaging thrust whenever convenient. They must construe them as the people did in their adoption, if the means of arriving at that construction are within their power. In these cases we thought we could arrive at it from the public history of the times."

The Justice's continued devotion to such precept was recorded 13 years later in *People* v. *Harding,* 53 Mich 481, 485:

"Every constitution has a history of its own which is likely to be more or less peculiar; and unless interpreted in the light of this history, is liable to be made to express purposes which were never within the minds of the people in agreeing to it. This the court must keep in mind when called upon to interpret it; for their duty is to enforce the law which the people have made, and not some other law which the words of the Constitution may possibly be made to express."

Yes, indeed, let us "enforce the law which the people have made, and not some other law which the words of the Constitution may possibly be made to express."

## CONCLUSION

Section 22 engages the word "change"; not the word "germane." Neither the latter, nor any synonym thereof, can be found in the entire legislative article of 1908. It is constitutionally possible that a newly purposed bill may be fitted to the title of a previously introduced bill, without offending section 21 of the fifth article, and yet result in offense to section 22. Thus, when the constitutional attack proceeds under section 21 we are obliged to ascertain the title-expressed object, but when the attack employs section 22 it is our duty to search for the "original purpose." The two are of different people-intendment else the people would have employed

the century-old word "object" in both sections. One cannot emphasize too strongly that section 22 is new; whereas section 21 is counterpart with well understood and many-times germane-applied sections 20 and 25 of the Constitution of 1850.

Modern proof shows that the people chose wisely by inclusion of section 22. The reports of this Court disclose too many instances where the judicial pen has—by the compulsion of necessary interpretation and occasional guesstimation—filled all manner of word-chasms resulting from hasty and careless amendatory action, especially action taken (as here) during the helter-skelter days which precede immediately a previously fixed deadline for consideration of bills. In this case, upon impetus of said section 22, the act of 1953 should be outlawed because this is an appropriate case for drawing, as inevitably our majority must some day draw, that definite line beyond which the legislature may not stray between introduction and enactment of important legislation. What is that line? Why it is simply that the specifically declared purpose of an introduced bill shall not be changed on its passage through either house; that any legislator desiring a change of such purpose must introduce a separate bill in order that the 2 may receive that publicity—to say nothing of careful deliberation—to which the people have an absolute right. A legislature thus warned by this Court is more apt to observe the people's will; that a bill should proceed from introduction to enactment without intervening change of its original and publicly understood aim.

There is, or at least should be, no difficulty of conformity with such requirement. Its faithful observance should, as the framers and electors of 1908 intended, "measurably improve the tone of legislative action." And Michigan could stand a bit of such tonal improvement as she makes currently "the

public history of the times." The music might even suggest to the legislature that its assigned task has long since become one demanding full-time with full-pay to complete exclusion of the distraction of private endeavor.

What is there to this case, in terse summary? The layman's answer—the popular answer—is easy to state. A bill originally purposed to levy a State income tax on all persons paying Federal income taxes was transformed, "in desperation as the session was drawing to a close," into a bill levying taxes on "business activities," the base of which was and is the innovation known as "value-added." Our majority says this transformation amounted to no change of original purpose within the restrictive mandate of said section 22. A tragic punnigram, that.

I would reverse and remand for entry of order denying the State's motion for judgment on the pleadings.

KAVANAGH, J., concurred with BLACK, J.